# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE APR 0 3 2014



CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Apr 3 2014

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| LEYA REKHTER, an individual receiving Medicaid benefits under the Community Options Program Entry System (COPES), and ALEX ZIMMERMAN, an aggrieved live-in care provider for an individual in the COPES program, LISA R. FUCHSER, an individual receiving Medicaid benefits under the Medicaid Personal care (MPC) program, and JUDITH L. ALBERTS, a live-in care provider for an individual in the MPC program, and PAUL RACCHETA, a live-in care provider for an individual in the COPES program, and others similarly situated,<br><br>Respondents/Cross-Appellants,<br><br>v.<br><br>STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, a Washington State Agency, ROBIN ARNOLD-WILLIAMS (individual and official capacities), Secretary of DSHS, DENNIS BRADDOCK (individual and official capacities), former Secretary of DSHS, KATHY LEITCH (individual and official capacities), Assistant Secretary for the Aging and Disability Services Administration, Jane and John Doe Nos. 1 thru 100,<br><br>Appellants/Cross-Respondents. | No. 86822-1<br><br>En Banc |
| NATASHA PFAFF, by and through her guardians, Maureen and Donald Pfaff, individually and on behalf of all other similarly situated persons,<br><br>Respondent/Cross-Appellant,<br><br>v.<br><br>ROBIN ARNOLD-WILLIAMS, in her official capacity as the Secretary of WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, and the WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES,<br><br>Appellants/Cross-Respondents. | |

SERVICE EMPLOYEES INTERNATIONAL UNION 775, on )
behalf of the individual providers it represents, and CINDY )
WEENS, individually and on behalf of all other similarly )
situated persons, )
                            )
        Respondents/Cross-Appellants, )
                            )
    v. )
                            )
ROBIN ARNOLD-WILLIAMS, in her official capacity as the )
Secretary of WASHINGTON STATE DEPARTMENT OF )
SOCIAL AND HEALTH SERVICES, and the WASHINGTON )
STATE DEPARTMENT OF SOCIAL AND HEALTH )
SERVICES, )
                            )
        Appellants/Cross-Respondents. )
                            ) Filed   **APR 0 3 2014**

OWENS, J. -- In this class action case, a jury found that the Department of Social and Health Services (DSHS) violated the implied duty of good faith and fair dealing in its contracts with individual providers who live with the DSHS clients for whom they provide care. The jury found that the providers incurred $57,123,794.50 in damages, and the judge awarded an additional $38,652,219.85 in interest. The DSHS clients who lived with their providers also filed a class action suit, but the judge did not allow them to recover any damages. We uphold the jury's verdict for the providers, the judge's decision to disallow the clients from recovering damages, and the dismissal of the providers' wage claims, because all comply with Washington law. However, we reverse the judge's award of prejudgment interest because the damages could not be determined with certainty.

2

FACTS

DSHS provides public assistance for in-home care for certain individuals with disabilities, referred to herein as "clients." To provide this assistance, DSHS contracts with individual care providers to perform necessary services for clients. In their contracts with DSHS, the providers agree to assist with those personal care services and household tasks included in the client's "service plan." The providers also agree that DSHS will pay only for authorized services in the client's service plan and that their monthly payment will not exceed the amount authorized in the service plan. The contracts explicitly incorporate by reference the service plan of the particular client, but because the contracts are signed before the service plan is created, key terms such as tasks to be performed and authorized hours are left undefined until long after the contract is executed.

Beginning in 2003, DSHS implemented the Comprehensive Assessment and Reporting Evaluation (CARE) process to determine how many hours of paid assistance a client was eligible to receive. Part of the CARE process was the shared living rule, which automatically reduced assistance for in-home care by 15 percent for clients that live with their providers. The rationale for the shared living rule was that the providers would already be performing certain household tasks (shopping, laundry, housekeeping, meal preparation, and wood supply services) even if they were not providing in-home care for a person with a disability. The shared living rule

created an irrebuttable presumption that clients living with their providers needed 15 percent less paid assistance, even if those clients did need assistance with those household tasks.

When DSHS reduced the authorized hours of support for a client pursuant to the shared living rule, it did not change or reduce the service plan's list of services the provider was required to perform. Indeed, even when a service plan specifically described a client's need for help with shopping or cooking as "[t]otal dependence" and instructed the caregiver to complete such tasks, DSHS still eliminated payment for such household tasks because the client lived with the provider. *See* Clerk's Papers (CP) at 3982-84. As a result, live-in providers were required by contract to perform necessary services without compensation. The structure of the agreements also resulted in DSHS requiring live-in providers to perform the same services as live-out providers for less compensation.

In 2004, three affected clients filed administrative appeals of determinations made pursuant to the shared living rule. The administrative law judges dismissed the appeals because they did not have authority to review the validity of agency rules. The three affected clients sought review in the courts, and in 2005, two trial courts held that the shared living rule was invalid under federal law. Those decisions were stayed pending a consolidated appeal, and in May 2007, this court affirmed the trial courts and found the rule violated federal law that required parity for individuals on

4

Medicaid. *Jenkins v. Dep't of Soc. & Health Servs.*, 160 Wn.2d 287, 290-91, 157 P.3d 388 (2007). Throughout this process, DSHS continued to apply the shared living rule. DSHS ultimately repealed the shared living rule effective June 29, 2007, and began reassessing affected clients—a process that was not completed until June 2008.

Shortly after *Jenkins*, separate class action lawsuits were filed on behalf of clients and providers affected by the shared living rule between April 2003 and June 2008. The lawsuits were consolidated in 2009. Prior to trial, the trial judge granted summary judgment to DSHS on the providers' claims that DSHS (1) wrongfully withheld wages in violation of RCW 49.52.050 and .070 and (2) failed to pay the providers for all hours worked, in violation of the Washington Minimum Wage Act (MWA), chapter 49.46 RCW.

At trial, the jury found that DSHS "breached an implied duty of good faith and fair dealing with the Providers as to [DSHS's] performance of a specific term in the Individual Provider Contracts." CP at 2985. The jury found that the providers incurred $57,123,794.50 in damages. The trial judge ruled that prejudgment interest applied to the jury's verdict for the providers, which amounted to $38,652,219.85.

The jury was not instructed to render an advisory verdict on the clients' claim, but the judge accorded the jury verdict on the providers' claim substantial weight in considering the clients' claim. The trial judge then found that the clients "suffered the same damages as the Provider Class" but that they should not be awarded a money

judgment because "the Client Class actually received the Rule related services and thus it sues to pass damages through to the Provider Class." CP at 3473-75.

DSHS appealed both the $57.12 million judgment and the award of $38.65 million in prejudgment interest. The clients and providers cross appealed, arguing that the clients should have been awarded damages. We granted direct review.

## ISSUES PRESENTED

1. As a matter of law, could the jury find that DSHS violated an implied duty of good faith and fair dealing?

2. Do the jury instructions accurately reflect the law related to the implied duty of good faith and fair dealing?

3. Did the trial judge correctly disallow compensation to clients in light of the judgment for providers?

4. Did the trial judge correctly grant summary judgment to DSHS on the providers' wage claims?

5. Was the trial judge's award of prejudgment interest proper?

6. Should any party receive attorney fees?

## ANALYSIS

*1. The Jury's Finding That DSHS Violated an Implied Duty of Good Faith and Fair Dealing Is Consistent with Washington Law*

The jury found that when DSHS implemented the shared living rule and automatically reduced the hours it would authorize for live-in providers, it breached

an implied duty of good faith and fair dealing as to its performance of a specific term in its provider contracts. DSHS claims that the jury's finding fails as a matter of law because it (1) contradicts the jury's other finding that DSHS did not breach a contract term; (2) adds a "free-floating obligation of good faith and fair dealing" to its contracts, Appellants' Opening Br. at 5, 29-30; and (3) enforces duties arising from a statute and not the terms of the contract.[1] Because the issue is whether the jury award is prohibited as a matter of law, our review is de novo. For the reasons described below, DSHS's arguments fail.

### A. The Duty of Good Faith and Fair Dealing Can Arise Even When There Is No Breach of an Express Contract Term

DSHS argues that as a matter of law, the jury cannot find a violation of the duty of good faith and fair dealing without first finding a violation of a contractual term. We disagree. As the Seventh Circuit has said, "[i]t is, of course, possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 766 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1784 (2011). Similarly, the California Supreme Court observed that the "breach of a specific provision of the contract is not a necessary

---

[1] The providers claim that DSHS is challenging the evidentiary basis for the jury's verdict and thus is barred from bringing this challenge because it failed to file a postverdict CR 50(b) or CR 59 motion. However, DSHS is not challenging the evidentiary basis for the verdict—it is challenging whether the law provides a basis for relief. Consequently, it is not barred from filing this appeal.

prerequisite [to a breach of good faith and fair dealing claim]. Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992) (citation omitted). The Seventh Circuit's and California Supreme Court's reasoning applies here. If DSHS's assertion were true, there could never be a violation of a duty of good faith and fair dealing unless there were also a violation of an express contract term. Such a requirement would render the good faith and fair dealing doctrine superfluous, and thus DSHS's claim is incorrect.

### B. The Duty of Good Faith and Fair Dealing Arises When One Party Has Discretionary Authority To Determine a Future Contract Term

DSHS argues that the jury's finding adds a "free-floating obligation of good faith and fair dealing" to its contracts. Appellants' Opening Br. at 5, 29-30. However, as described below, the duty of good faith and fair dealing arises when one party has discretionary authority to determine a future contract term. Here, the contracts gave DSHS the discretionary authority to pay providers for authorized hours pursuant to the service plans, which were developed at the discretion of DSHS after the contracts were finalized. Thus, the duty of good faith and fair dealing arose in connection with those contract terms, and the jury found that DSHS breached that duty as to the performance of a specific contractual term. As a result, DSHS's claim

8

that the jury added a "free-floating obligation of good faith and fair dealing" is incorrect.

Under Washington law, "[t]here is in every contract an implied duty of good faith and fair dealing" that "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). DSHS and the providers agree that the implied covenant of good faith and fair dealing cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties. Instead, "the duty [of good faith and fair dealing] arises only in connection with terms agreed to by the parties." *Id.*; *Johnson v. Yousoofian*, 84 Wn. App. 755, 762, 930 P.2d 921 (1996) ("The implied duty of good faith is derivative, in that it applies to the performance of specific contract obligations. If there is no contractual duty, there is nothing that must be performed in good faith." (citations omitted)).

In particular, the duty of good faith and fair dealing arises "when the contract gives one party discretionary authority to determine a contract term." *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 738, 935 P.2d 628 (1997); *see Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) ("The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time."). When asked to apply Washington law in this area, the Ninth Circuit concluded that "[g]ood faith *limits* the

authority of a party retaining discretion to interpret contract terms; it does not provide a blank check for that party to define terms however it chooses." *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001).

In this case, the contract gave DSHS discretion over future terms. DSHS has a specific contractual obligation to determine and pay providers for hours authorized in the service plans. DSHS prepared the service plans after the contract was formed with the providers and after the providers began performing services. Thus, at the time that DSHS and an individual provider executed a provider contract, neither DSHS nor the provider knew what services would be needed by the clients or how much would be paid to the providers. These provisions give DSHS the discretion to set a future contract term: the quantity of hours and the types of services for which providers will be compensated.

The dissent contends that DSHS does not have discretion to determine the quantity of hours for which providers will be compensated because that amount is determined by the CARE process, and DSHS does not have discretion to deviate from the amount determined through the CARE process. This ignores the fact that DSHS *created the CARE process using its discretion.* While there were some statutory limitations placed on DSHS, those statutes did not prescribe how DSHS was to determine the hours of care for which a DSHS client is eligible. Instead, DSHS had ample discretion to design the process that set the contractual term.

The dissent acknowledges that *Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083 (W.D. Wash 2011), came to the same conclusion that we do: that the implied duty of good faith and fair dealing applies when one party has discretion to select the formula or method used to calculate a particular value in the contract. But the dissent essentially argues that because DSHS has multiple roles as a government agency, it is exempt from the duty of good faith and fair dealing. This is an artificial distinction. It does not acknowledge DSHS's role in both negotiating the contract and using its discretion to determine a key term of the contract by designing the CARE process that controlled the number of hours authorized as part of the client's service plan. A head that wears two hats is nonetheless only one head. Exempting DSHS from this duty because it is a government agency is not supported by our precedent, and we decline to adopt such an exemption without justification.

The dissent contends that both parties were "bound by the hours authorized by the service plan," Dissent at 7-8 (emphasis omitted), and thus DSHS did not have discretion over the hours authorized. But it is unreasonable to conclude that DSHS was simply "bound" by the service plan when that plan was created using a formula of DSHS's own design. In this case, DSHS used its discretion to implement a new rule that eliminated a certain amount of compensation for those service providers that lived with the clients. We do not see how one can come to the conclusion that DSHS had no discretion in determining the number of hours of care for which a client is eligible

when DSHS was the entity that created the system—using its discretion—that determined those hours.

The dissent argues that DSHS did not have discretion because certain procedural steps would have to be taken for it to change the CARE process. But the existence of such procedural requirements simply means that DSHS did not have unconditional authority to change the process. While governmental agencies have some procedural limitations on their discretion, it does not follow that substantively they have no discretion. Such a conclusion is overly formalistic and ignores the on-the-ground reality that DSHS was the party that had control over the formula for authorized service hours.

As described above, when a party has discretion over a future contract term, it has an implied duty of good faith and fair dealing in setting and performing that contractual term. Here, the contract provided that service providers would be paid for the hours authorized in the service plan pursuant to the CARE process. DSHS was the party responsible for determining the hours that would be authorized because it designed the CARE process that produced that determination. When DSHS exercised discretion to create the systems that produced the service plans and reduce the hours those plans authorized for live-in providers, its actions were governed by an implied covenant of good faith, and the jury found that DSHS violated that covenant.

In light of the jury's finding that DSHS breached the duty of good faith and fair dealing as to a specific term in the contract, DSHS's reliance on cases where the duty of good faith did not apply because there was no contract term is misplaced. *See, e.g.*, *Badgett*, 116 Wn.2d at 570-72 (holding that "[w]hile the parties may choose to renegotiate their agreement, they are under no good faith obligation to do so"); *Yousoofian*, 84 Wn. App. at 762-63 (holding that the duty of good faith did not apply to a landlord's refusal to consent to a lease agreement when the contract gave the landlord the unconditional right to do so); *Seattle-First Nat'l Bank v. Westwood Lumber, Inc.*, 65 Wn. App. 811, 820, 822-23, 829 P.2d 1152 (1992) (holding that the trial court erred by imposing a duty of good faith on Seattle-First in relation to a course of dealing when that course of dealing conflicted with the express terms of the contract). DSHS relies heavily on *Monotype Corp. PLC v. International Typeface Corp.*, but in that case the jury found that the parties did not intend for the contract to prohibit certain conduct, and therefore it would be redundant to ask whether that conduct breached an implied covenant of good faith. 43 F.3d 443, 452-53 (9th Cir. 1994). None of these cases concern a contract like this one, where one party retained discretionary authority to determine a future contract term.

### C. A Statutory Violation Can Constitute a Breach of Duty of Good Faith and Fair Dealing

DSHS argues that even if there was a duty of good faith and fair dealing, no breach could be found because that would depend on enforcing external, statutory

duties. DSHS argues that Medicaid comparability is a statutory duty owed to clients, not a contractual duty owed to providers. DSHS contends that because the providers' legal basis for relief is created by statute, it cannot be enforced as an implied contractual duty.

DSHS confuses *what* is violated with *how* it is violated. While DSHS is correct that a breach of a duty imposed by statute does not create an action on contract, *Boguch v. Landover Corp.*, 153 Wn. App. 595, 615, 224 P.3d 795 (2009), the duty that providers seek to enforce here is a contractual duty around a contractual term. The contractual term is the determination of the hours of care for which each client is eligible, and DSHS had discretion in its performance of that term because it created the CARE process that made that determination. Therefore, DSHS had an implied duty of good faith and fair dealing in its performance of that term. Here, the jury found that DSHS violated that contractual duty when it decided to automatically reduce the payments for in-home care providers. Furthermore, excusing breaches of the duty of good faith when those breaches are also statutory violations would neither protect the reasonable expectations of contracting parties nor encourage parties to obey the law.

Because we uphold the jury's verdict for the providers, we need not analyze the providers' alternative theories of recovery.

2. *The Jury Instructions Accurately Reflected the Law Related to the Implied Duty of Good Faith and Fair Dealing*

DSHS claims that jury instructions 18 and 19 misstated the law related to the implied duty of good faith and fair dealing and that the judge abused his discretion by failing to give its proposed jury instructions 35, 35A, and 25A. "Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law." *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996). Because the jury instructions in this case, when read as a whole, accurately state the law, are not misleading, and allow both sides to argue their theory of the case, there is no error.[2]

DSHS first claims that instruction 19 required the jury to apply the duty of good faith and fair dealing even if the shared living rule was not part of the contract. Appellants' Opening Br. at 43-44. DSHS points to the first sentence of instruction 19:

---

[2] The respondents claim that DSHS's exceptions to the jury instructions were not specific enough at trial to allow the trial judge to fully understand their legal claims, and thus DSHS failed to preserve its appeal. We disagree. After discussing each of the potential jury instructions, DSHS attempted to describe each of their exceptions in detail on the record and the trial judge responded, "And let me add here that we've had extensive discussions about these instructions. I believe I understand your positions. At this point I am not going to change the instructions that I'm going to give. And all of your arguments on why they are incorrect are preserved in the record. You don't need to put them in the record now; just make clear that you are excepting to them so that you've got an appealable issue." 14 Verbatim Report of Proceedings at 2602. On this record, we do not see how we could conclude that DSHS did not properly describe their exceptions at trial.

> If you find that reduction of authorized hours by application of the Shared Living Rule was not a part of the provider contract, you must consider the claim that the department violated the duty of good faith and fair dealing in applying the SLR.

CP at 2980. However, that introductory sentence merely indicated that if the jury found that DSHS's application of the shared living rule did not violate an express term of the contract, the jury must then turn to the question of whether the application of the rule violated the duty of good faith and fair dealing. The jury instructions overall make it quite clear that the duty of good faith and fair dealing applies only in relation to the performance of specific terms of the contract. *See, e.g.*, CP at 2979 (Instruction 18 states, "[The] duty of good faith and fair dealing . . . exists only in relation to the performance of specific terms in the contract and cannot be used to contradict contract terms or require a party to accept new or different contract obligations."). Indeed, the question to the jury on the verdict form specifically states, "Do you find that [DSHS] breached an implied duty of good faith and fair dealing with the Providers *as to* [*DSHS's*] *performance of a specific term in the Individual Provider Contracts?*" CP at 2985 (emphasis added). Taken in context, instruction 19 is not misleading.

In a very similar claim, DSHS claims another sentence in instruction 19 fails to indicate that the duty of good faith and fair dealing arises only in relation to the performance of a specific contract term. The relevant sentence states:

> To establish breach of the implied duty of good faith and fair dealing, providers must prove that in reducing a client's authorized hours by application of the SLR, the department acted in a manner that prevented

16

the provider from attaining his or her reasonable expectations under the contract.

CP at 2980. But this sentence does not attempt to list all of the requirements that providers must prove—it is simply listing one of the elements that the providers must prove in order to prevail on their claim. As noted above, the rest of the instructions describe the other elements of a breach of good faith and fair dealing claim, including that the duty arises only in relation to the performance of specific terms of the contract. *See* CP at 2980, 2985. "It has long been the rule of this court that individual instructions may not be singled out for consideration without reference to the entire set of instructions which were given." *Nelson v. Mueller*, 85 Wn.2d 234, 238, 533 P.2d 383 (1975). Looking beyond individual sentences, which can state only one portion of a rule, the jury instructions as a whole accurately reflect the law.

Next, DSHS claims that instruction 19 was incorrect when it indicated that (1) if the contract gives the department unconditional authority to determine a contract term there is no duty of good faith and fair dealing but (2) if the contract does not give unconditional authority "or is silent as to the department's authority," the jury must determine whether the duty has been breached. CP at 2980. DSHS does not actually argue that this inaccurately reflects the law and does not point to any cases that contradict this statement of the law; instead, DSHS essentially challenges how the jury applied the law to this case. In fact, the instructions accurately reflect the case law in this area: the duty of good faith and fair dealing arises when a contract gives a

party discretionary authority to determine a contract term. *See Goodyear Tire*, 86 Wn. App. at 738. However, if a contract gives a party unconditional authority to determine a term, there is no duty of good faith and fair dealing. *See Yousoofian*, 84 Wn. App. at 762-63 (where landlord had an "absolute privilege" to refuse to consent to a tenant's lease assignment, there was no contractual duty to which the duty of good faith attached). Appellants do not show how this instruction constituted error.

Finally, DSHS claims that the trial court abused its discretion when it declined to give proposed instructions 25A, 35, and 35A. Instruction 25A stated that the CARE tool and federal regulations were terms of the provider contract merely because the service plans and federal regulations are incorporated into the contract by reference. Instruction 35 addressed the same issues as instructions 18 and 19 but did not include certain sentences that DSHS found problematic, as described in the paragraphs above. Instruction 35A stated that the provider contracts did not include a duty to disclose providers of the impact of the shared living rule, and thus the failure to disclose did not constitute a breach of contract or of the implied duty of good faith and fair dealing.

A trial judge's decision not to issue a jury instruction is reviewed for abuse of discretion. *Stiley v. Block*, 130 Wn.2d 486, 498, 925 P.2d 194 (1996). When this court reviews jury instructions, it looks to the jury instructions as a whole, with the primary purpose of allowing both parties to fairly state their case. *See Gammon v.*

*Clark Equip. Co.*, 104 Wn.2d 613, 616-18, 707 P.2d 685 (1985) (evaluating whether excluding a particular jury instruction was error when reading the jury instructions as a whole rather than examining the missing jury instruction standing alone). Here, DSHS does not show how the trial judge's decision against these instructions constituted an abuse of discretion. As a whole, the jury instructions allowed both sides to argue their theory of the case, accurately stated the law, and were not misleading; as a result, we see no basis for overturning the jury verdict.

3. *The Trial Judge Correctly Disallowed Compensation to Clients in Light of the Judgment for Providers*

In their cross appeal, the clients challenge the trial judge's ruling that they are not entitled to judgment for damages. The trial judge reasoned that the client class should not be awarded a money judgment because the clients sued to pass damages through to the provider class. Since judgment was entered for the providers, judgment could not also be entered for the clients to pass through to the providers. In accordance with this court's policy of preventing double recovery, we affirm the trial judge's ruling.

Although the parties cite no case law regarding this precise type of double recovery—judgment for both contractors that were not paid for providing services to clients and for the clients themselves—Washington courts have consistently implemented rules designed to prevent double recoveries. *See Lange v. Town of Woodway*, 79 Wn.2d 45, 49, 483 P.2d 116 (1971) (adopting the election of remedies

19

doctrine for "the sole purpose of preventing double redress for a single wrong"); *Rice v. Janovich*, 109 Wn.2d 48, 61-62, 742 P.2d 1230 (1987) (holding that the trial court erred by giving jury instructions for both assault and outrage for the same conduct because it allowed for the possibility of double recovery); *Sherry v. Fin. Indem. Co.*, 160 Wn.2d 611, 621-22, 160 P.3d 31 (2007) (discussing rules designed to prevent double recovery in the context of an underinsured motorist).

In this case, the trial judge ruled that

> the Client Class is not entitled to judgment for the damages because judgment for that amount will be entered in favor of the Provider Class and only one recovery can be permitted. The presence of a judgment entered in favor of the Provider Class precludes entry of a judgment in favor of [the] Client Class.

CP at 3475. Essentially, the trial judge reasoned that the two lawsuits were alternative theories of recovery and that only one should be allowed. *See id.* ("the Client Class actually received the Rule related services and thus it sues to pass damages through to the Provider Class"). The clients suggested that they could receive an award offset by the judgment for the providers. Presumably, the purpose of such an offset award would be to allow the clients to recover attorney fees as the prevailing party. *See* Part 5, *infra*. The trial judge declined that option, noting that the ruling for the clients "must account for and acknowledge" the final judgment entered for the providers. CP at 3475. He further reasoned that "the clients cannot receive directly the monetary payment for services that were wrongfully withheld." CP at 3476.

We affirm the trial judge's reasoning. Although the parties chose to bring claims resting on alternative theories of recovery, the judge found that the providers and the clients suffered the same damages. As a result, entering judgments for both classes would amount to a double recovery, a result courts seek to avoid. The clients sought damages in order to compensate providers for the services they performed without compensation—compensation the providers received in the form of damages for their contract claim. Once judgment was entered for the providers, the trial judge appropriately disallowed a monetary judgment for the clients under their alternative theory of recovery.

The clients point to a seemingly inconsistent finding of fact from the trial judge: "The court finds that the Client Class suffered the same damages as the Provider Class, $57,123,794.50." CP at 3473-74. However, the court went on to clarify that "[t]he Client Class has proved the same damages claimed by the Provider Class claim, *except that the Client Class actually received the Rule related services.*" CP at 3475 (emphasis added). Thus the trial judge's earlier finding does not undermine his legal conclusion that he could not enter judgment for both classes because it would amount to double recovery.

Because we affirm the trial judge's ruling that the clients are not entitled to recovery, we do not reach DSHS's other arguments as to why the clients are barred from recovery.

21

*4. The Trial Judge Correctly Granted Summary Judgment to DSHS on the Providers' Wage Claims*

Prior to trial, the judge granted summary judgment to DSHS on the providers' claims that DSHS had (1) wrongfully withheld wages in violation of RCW 49.52.050 and .070 and (2) failed to pay the providers for all hours worked in violation of the MWA. The providers cross appealed this ruling, arguing that (1) DSHS is the payroll agent for the clients and thus has liability under RCW 49.52.050 and .070 and (2) DSHS had forced providers to perform unpaid, off-the-clock work, thus violating the MWA. We affirm the trial judge.

First, while RCW 49.52.050 and .070 do apply to agents of employers, the providers have not shown that DSHS is an agent for the client. The providers contend that an entity is an agent if it "has control over the funds or the decision to pay" based on *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wn.2d 514, 522, 22 P.3d 795 (2001). Br. of Resp'ts Rekhter et al. at 76. But that is not what *Ellerman* holds. In *Ellerman*, we held that in order to prevail on a wage claim, the employee must show that the party withholding the wages was *both* an agent and had control over the payment of wages. 143 Wn.2d at 522-23 ("the statutes in question require *more than* the establishment of an agency relationship. Rather, there must be a showing that an agent had some control over the payment of wages before personal liability attaches to the agent." (emphasis added)). And here, the providers have not shown any agency relationship under the common law.

Second, the MWA applies to the employer-employee relationship, which does not apply to DSHS's relationship with the providers. The MWA defines "'[e]mployer'" as "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." RCW 49.46.010(4). The providers argue that DSHS was acting in the interest of an employer because it controlled payment to the providers. However, as discussed above, DSHS's role as a payor of Medicaid funds did not create an agency relationship between the client and DSHS. In addition, under state law, the state is considered the employer of the providers "[s]olely for the purposes of collective bargaining." RCW 74.39A.270(1). Furthermore, the contract between DSHS and the providers expressly states that the contractor is not "an officer, employee, or agent of DSHS" and that the provider "agrees not to claim for the [provider] any rights, privileges or benefits which would accrue to an employee of the State of Washington." Ex. 1, at 5. The trial judge correctly granted summary judgment to DSHS on the providers' wage claims.

*5. The Trial Judge's Award of Prejudgment Interest Was Improper*

DSHS appeals the trial court's award of prejudgment interest, contending that the damages could not have been calculated with certainty prior to the entry of judgment. Prejudgment interest is available "(1) when an amount claimed is 'liquidated' or (2) when the amount of an 'unliquidated' claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable

23

by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion." *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968). A claim is liquidated "where the evidence furnishes data which, if believed, makes it possible to compute the amount with *exactness*, without reliance on opinion or discretion." *Id.* (emphasis added); *see* 1 DAN B. DOBBS, DOBBS LAW OF REMEDIES § 3.6(1), at 337 (2d ed. 1993) (citing *Hansen v. Rothaus*, 107 Wn.2d 468, 472-73, 730 P.2d 662 (1986)). The rationale for this rule is that it would be unfair to hold a defendant accountable for interest on an amount that is unquantifiable and unforeseeable prior to a jury verdict. A defendant cannot stop the running of interest by paying the plaintiff if that defendant does not know the amount due. *See* DOBBS, *supra*, at 351-52.

The damages in this case are the difference between what providers were paid under the shared living rule and what providers should have been paid under the individualized CARE formula. However, the CARE formula requires individualized data to be entered in order to determine the number of paid hours, and such data was not entered or collected during the times at issue in this case. Thus, at trial the jury heard from various experts who testified as to how to estimate what data *would have been entered* into the CARE formula without the shared living rule.

DSHS argues that because the individualized data called for under the CARE assessment was not collected during the period of the shared living rule, the

authorized hours cannot be determined with exactness. If the authorized hours for each client cannot be determined with exactness, then the provider class's damages cannot be determined exactly and prejudgment interest is not allowed. We agree. While the mathematical methods of estimation provided by the experts might be statistically sophisticated, ultimately they provided only estimates. Because the relevant data was never actually entered or collected, there was no way for the jury to determine how many uncompensated hours were worked and thus what the exact amount of damages was. Since the damages are neither liquidated nor ascertainable, prejudgment interest is unavailable.

### 6. *There Is No Basis on Which to Award Attorney Fees to Any Party*

DSHS has not requested attorney fees nor appealed any trial court decisions on attorney fees and costs. Thus, this court has no basis for awarding attorney fees to DSHS.

The providers argue that they should be awarded attorney fees pursuant to RCW 49.52.070. However, that statute applies to employers who fail to pay wages. The providers prevailed on a contract claim and not on their wage claims. As a result, the providers have provided no statutory basis for attorney fees.

Finally, the clients argue that they should be awarded attorney fees under the policy underlying RCW 74.08.080(3). That statute provides for attorney fees for a DSHS client or applicant if "the superior court, the court of appeals, or the supreme

court renders a decision in favor of the appellant." RCW 74.08.080(3). The purpose

of that policy is both punitive and deterrent, as it is "designed to encourage the agency

to render careful and correct decisions at the initial stage, under penalty of having to

pay the costs of correcting its mistakes when its decisions are overturned on appellate

review." *Whitehead v. Dep't of Soc. & Health Servs.*, 92 Wn.2d 265, 269-70, 595

P.2d 926 (1979). However, as discussed above, the trial judge concluded that "[t]he

Client Class has proved the same damages claimed by the Provider Class claim,

except that the Client Class actually received the Rule related services." CP at 3475.

The trial judge then entered judgment for the provider class but not the client class.

Since the trial court did not enter a decision in favor of appellants, they do not qualify

for attorney fees under the statute.

## CONCLUSION

After a lengthy trial, a jury found that DSHS violated its duty of good faith and

fair dealing in the performance of a specific term of its contracts with providers. This

verdict accords with relevant law and we affirm it. We also affirm the trial judge's

ruling that the clients cannot recover because they sued only to pass the damages

through to the providers, and the decision to grant summary judgment to DSHS on the

providers' wage claims. However, we reverse the trial judge's award of prejudgment

interest because the damages could not be determined with certainty.

WE CONCUR:

_Owens, J._

_Wiggins, J._

_González, J._

_Gordon McCloud, J._

No. 86822-1

C. JOHNSON, J. (concurring/dissenting)—While I concur in upholding the jury's verdict for the provider class, I dissent as to the reversal of the trial court's award of prejudgment interest. Awarding prejudgment interest on the contract damages due to the provider class in this case is consistent with Washington case law and its underlying policy. I would therefore affirm the award.

The lead opinion correctly states the rule on when prejudgment interest is warranted but misapplies it, failing to adhere to our prior cases. The rule is that prejudgment interest is available

> (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion.

*Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968). A claim is liquidated "where the evidence furnishes data which, if believed, makes it

possible to compute the amount with exactness, without reliance on opinion or discretion." *Prier,* 74 Wn.2d at 32; *see* 1 DAN B. DOBBS, LAW OF REMEDIES § 3.6(1), at 337 (2d ed. 1993) (citing *Hansen v. Rothaus,* 107 Wn.2d 468, 472-73, 730 P.2d 662 (1986)).

This case is remarkably similar to *Stevens v. Brink's Home Security, Inc.,* 162 Wn.2d 42, 169 P.3d 473 (2007), where we upheld the prejudgment interest awarded to the plaintiffs in that case. In *Stevens,* security company technicians brought a class action to recover overtime compensation for the drive times spent commuting to the first and last jobsites, for which the technicians had neither kept time records nor been paid. At trial, an expert calculated the drive times using a software program called "Mappoint." Brink's contended that this data was insufficient to constitute a liquidated claim entitled to prejudgment interest because it required the jury to rely on opinion or discretion. We disagreed and concluded that prejudgment interest is appropriate where the evidence furnishes objective data that, if believed, makes it possible to compute the amount owed with exactness. We held that the technicians' damages were liquidated and subject to prejudgment interest, reasoning that the jury could believe the drive times calculated with Mappoint and use it along with the technicians' actual wages to calculate damages. The same reasoning should apply here.

As in *Stevens*, the providers' damages in this case were capable of being determined with exactness by using an hours worked times hourly rate calculation. Here, both parties used reliable mathematical calculations to determine the number of unpaid hours that the Department of Social and Health Services (DSHS) wrongfully withheld from the providers, much like the computer algorithm and statistical analysis used to calculate the hours that went unpaid in *Stevens*. Interestingly, at trial, DSHS acknowledged that the damages were capable of accurate calculation and seemed to dispute only *how* to calculate the damages, stating, "Neither side, neither party has questioned the . . . reliability of the statistical analyses. . . . That isn't what the dispute is. The dispute is, how do you get to your particular numbers and which criteria do you use." 14 Verbatim Report of Proceedings at 2779. Although DSHS now disputes the accuracy of the statistical analysis used by its own experts to calculate the hours that went unpaid, as we said in *Stevens*, this does not render the claim unliquidated. The jury could believe the expert testimony regarding the number of unpaid hours and use it along with the providers' hourly rate in the contract to calculate damages. Therefore, no discretion or opinion was required to enable the jury to determine how much the providers should have been paid had the shared living rule not been in effect.

Although a claim is unliquidated if the fact finder must exercise discretion, Washington cases have stressed that the act of fact finding is distinct from the exercise of discretion. In *Dautel v. Heritage Home Ctr., Inc.*, 89 Wn. App. 148, 948 P.2d 397 (1997), an employee filed a claim against her former employer for wages and commissions owed. Although the parties disputed the percentage to be applied to the employee's unpaid commissions (the employee argued it should be 20 percent and the employer argued it should be 10 percent), the damage award was a liquidated sum because it "could be computed with exactness once the trial court determined that [the employee] was entitled to her full commission rate of 20 percent." *Dautel*, 89 Wn. App. at 155. Similarly, in *Egerer v. CSR W., LLC*, 116 Wn. App. 645, 67 P.3d 1128 (2003), a landowner sued an excavation contractor for failing to deposit fill on the landowner's property, as arranged under contract. Although both parties agreed that the measure of damages was the difference between the market price of fill and the contract price, the parties presented conflicting evidence of market price ranging from $1.10 to $46.80. The damages in that case were a liquidated sum because

> [l]ike *Dautel*, where the trial court exercised discretion only to find the appropriate commission percentage, the trial court here exercised discretion only to find the appropriate market price. The amount . . . actually owed could be computed with exactness once the trial court found that $8.25 per cubic yard was the market price.

*Egerer,* 116 Wn. App. at 654. As in *Dautel* and *Egerer,* once the jury resolved the conflicting evidence over the number of hours eliminated by the shared living rule, damages could be computed with exactness.

By comparison, Washington cases establish that a claim is unliquidated where the amount claimed may not be arrived at by computation but instead requires the jury to make an award based on opinion or discretion. *See Aker Verdal A/S v. Neil F. Lampson, Inc.,* 65 Wn. App. 177, 192, 828 P.2d 610 (1992) (claim for labor costs was unliquidated since "it was within the jury's discretion to determine a reasonable hourly rate"); *Maryhill Museum of Fine Arts v. Emil's Concrete Constr. Co.,* 50 Wn. App. 895, 751 P.2d 866 (1988) (claim was unliquidated where a museum, which was damaged by water leaks, was unique and thus without a market value so that the measure of damages was left to the fact finder's discretion); *Ski Acres Dev. Co. v. Douglas G. Gorman, Inc.,* 8 Wn. App. 775, 508 P.2d 1381 (1973) (claim was unliquidated where the jury resolved the reasonableness of the cost of repairing damage to a building). In this case, the jury was not asked to determine the reasonableness of the hours that the provider class worked, the hourly rate paid, or the amount of damages. Rather, both parties presented the jury with damage calculations that were based on mathematical

5

formulas specified in the contract and DSHS's own regulations. The trial judge properly concluded that the claim was a liquidated sum.

The lead opinion concludes that prejudgment interest is not proper here because the damage calculations required individualized data which DSHS did not collect during the period of the shared living rule, and therefore the calculations were not exact but "only estimates." Lead opinion at 25. But our state's cases have never required complete certainty in order for a claim to be deemed liquidated. *See McConnell v. Mothers Work, Inc.*, 131 Wn. App. 525, 536, 128 P.3d 128 (2006) (damages were liquidated even though experts for both sides testified that an exact computation of overtime hours worked by the managers was impossible). In *Stevens*, the drive times were not documented or calculated during the period at issue yet we still upheld the award of prejudgment interest. And the drive times calculated by the computer software in that case were "only estimates" because the exact drive times may have been longer or shorter due to traffic volumes, inclement weather, or variable driving speeds of each technician.

Moreover, as we previously noted, "'It may be safely said that the tendency has been in favor of allowing interest rather than against it, and that the degree of certainty or ease with which the approximate amount can be ascertained has grown less and less stringent.'" *Prier,* 74 Wn.2d at 34 (quoting 5 ARTHUR LINTON

CORBIN, CORBIN ON CONTRACTS § 1046 n.69, at 280 (1964)). "Washington courts generally favor prejudgment interest based on the premise that a party that retains money it should have paid to another should be charged interest." *Pierce County v. State*, 144 Wn. App. 783, 855, 185 P.3d 594 (2008). It "compels a party that wrongfully holds money to disgorge the benefit." *Mahler v. Szucs*, 135 Wn.2d 398, 430, 957 P.2d 632 (1998).

Although the jury found DSHS's expert witnesses persuasive and ultimately adopted a number within its range of damage calculations, DSHS now contends that the damages could not have been calculated with certainty prior to the entry of judgment. But DSHS has always been able to calculate the amount it owed based on the contract formula. In fact, the hours and corresponding lost wages leading to the jury's verdict were calculated and based upon the department's own regulations and data, statistical analysis, and upon wage and benefit information in the collective bargaining agreements.[1] The trial court's decision to award prejudgment interest on the contract damages properly compels DSHS to disgorge this benefit and compensates plaintiffs for the delay in receiving the funds due to them. For these reasons, I would affirm the trial court in all respects.

---

[1] Although the amount of damages awarded to the providers is substantial, part of that is because DSHS chose to continue applying the shared living rule for years after the first trial court held it to be invalid. The complexity in this case was perhaps caused by the State's delay in continuing to apply the shared living rule after invalidation.

*Rekhter, et al. v. State, et al.*

No. 86822-1

STEPHENS, J. (dissenting)—The lead opinion embraces the providers' misguided argument that the Department of Social and Health Services' (DSHS) *statutory* obligations in developing client service plans translate into *contractual discretion* to determine a future contract term. As a result it authorizes the use of a private contract action to impose on the State what amounts to strict liability for misinterpreting federal Medicaid comparability law. I respectfully dissent. I would reverse the judgment in favor of the providers on their claim for breach of the implied duty of good faith and fair dealing, and I would affirm the trial court's dismissal of their alternative claims. I would also affirm the trial court's decision disallowing recovery to the client class but on the ground that the client class action is barred by the statute of limitations or a failure to exhaust administrative remedies.[1]

---

[1] I agree with the lead opinion's analysis concluding DSHS preserved its issues on appeal and with its discussion of attorney fees. Thus, I do not address these issues.

A. The providers' claim for breach of the implied duty of good faith and fair dealing fails as a matter of law

The duty of good faith and fair dealing implicit in a contractual relationship "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979). But this duty cannot add to or change the terms of the contract. *Badgett*, 116 Wn.2d at 569. Rather, "it requires only that the parties perform in good faith the obligations imposed by their agreement." *Id.* The purpose of implying the obligation of good faith and fair dealing is to preserve the mutuality of obligations in a contract by assuring that the party who retains authority to specify the manner of a certain performance cannot thereby render a promise illusory. *See Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 61, 122 Cal. Rptr. 2d 267 (2002).[2] It has therefore been recognized that the implied duty of good

---

[2] The *Storek* court explained that the rationale behind tests "for evaluating a promisor's satisfaction relates to the familiar issue of whether a promise is illusory." 100 Cal. App. 4th at 61. It noted:

> *Parallel reasoning applies when the promisor is expressly given absolute discretion to perform and when the promisor's performance is expressly conditional upon the promisor's satisfaction.* In both instances, courts will imply a covenant of good faith to limit the promisor's express contractual authority only when necessary to create mutuality. [Where] the promisor has discretion to perform but has given other consideration or, when, as here, the promisor's performance is conditional on his objectively reasonable satisfaction, then the promisor's ability to avoid performance is sufficiently curtailed, the promise is not illusory, and the covenant of good faith and fair dealing need not be implied to create a binding promise.

*Id.* (emphasis added).

faith and fair dealing arises where a term in the contract affords one party discretion in the manner of its performance. *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 738, 935 P.2d 628 (1997); 23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63:22, at 513-16 (4th ed. 2002).

Here, the providers' sought recovery on the theory that "the contract includes an implied duty of good faith and fair dealing in the department's performance of the contract, specifically in making its determination of the maximum authorized hours for which it would compensate a provider." Clerk's Papers (CP) at 2972 (Jury Instruction 11). They argued that the "contract obligated the department to pay for all authorized services provided under the contract and that the department breached the contract when it reduced authorized hours by application of the Shared Living Rule." *Id.* The jury was instructed that DSHS reserved contractual discretion in determining the maximum hours for which it would compensate a provider if the contract did not give DSHS unconditional authority to determine the hours or was silent as to its authority. CP at 2980 (Jury Instruction 19).

This approach to establishing a duty of good faith and fair dealing was misguided from the start. DSHS's obligation to determine authorized hours of care for each client is not a contractual obligation, express or implied. Rather it is a statutory duty owed to the clients, not the providers, and the contract simply requires DSHS to pay each provider based on the individual client's service plan. As

explained below, DSHS retained no discretion under the contract giving rise to the implied duty of good faith and fair dealing.

    *1. As a matter of law, the terms of the contract did not leave DSHS discretion requiring application of the implied duty of good faith and fair dealing in developing each client's service plan*

The interpretation of a contract can be a mixed question of law and fact. *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 424 n.9, 191 P.3d 866 (2008). But where the contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation is a question of law. *Id.*; *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996); see *Badgett*, 116 Wn.2d at 568-69 (explaining that whether promisor had a duty under the contract is a threshold question of law).

Here, the providers have not argued that the contract is ambiguous or that we must resort to extrinsic evidence to ascertain its meaning. Instead, they argue the contract implies a duty of good faith and fair dealing because it contains a discretionary term. *See* Br. of Resp'ts Rekhter, et al. at 24;[3] CP at 2980 (instructing the jury that the duty applies where the contract does not give the department unconditional authority or is silent as to the department's authority). Whether the contract contains a discretionary term depends on contract interpretation, a question

---

[3] Class representative Leya Rekhter has filed a brief with this court. So has named plaintiff Cindy Weens, along with the providers' union, the Service Employees International Union (SEIU). I refer to these parties collectively as "the providers." When citing to their briefing, I designate whether it is Rekhter's brief or the brief of SEIU and Weens.

of law in these circumstances. Accordingly, I agree with the lead opinion that the proper standard of review is the de novo standard.

As a matter of law, the contract here did not contain an unstated future term that DSHS retained discretion to determine. The lead opinion wrongly concludes otherwise. The relevant contract language reads:

> DSHS will pay the Contractor the established rate for services per client in the geographic area where services are provided within Washington State. Rates will apply to all services authorized and provided under this Contract no matter what the payment source. The monthly payment for all services provided to any client will not exceed the amount authorized in the client's Service Plan. Rate changes will not require a Contract amendment. Notification of rate increases will be made by publication of the DSHS Aging and Adult Services Administration rates in the Contractor's geographic area. Published rates are not disputable.
> . . . .
> DSHS will only reimburse the Contractor for authorized services provided to clients in accordance with this Contract's Statement of Work and the client's Service Plan.

Appellants' Opening Br., App. at 32 (Client Service Contract, Individual Provider Services (Contract) § 4(b), (e)). Under the express terms of the contract, DSHS was required to pay the providers for the hours authorized by the client's service plan. DSHS did not retain discretion under the contract to modify the hours for which the provider was to receive payment. That figure was to be determined solely by reference to the client's service plan. Any discretion DSHS exercised in creating client service plans was not part of the performance of the provider contracts but was integral to DSHS's statutory duty. *See, e.g.*, RCW 74.39.005(5) (charging DSHS with ensuring that long-term care service options are made available to functionally

disabled persons while "maximi[zing] the use of financial resources in directly meeting the needs of persons with functional limitations").

The lead opinion argues:

> DSHS prepared the service plans after the contract was formed with the providers and after the providers began performing services. Thus, at the time that DSHS and an individual provider executed a provider contract, neither DSHS nor the provider knew what services would be needed by the clients or how much would be paid to providers. These provisions give DSHS the discretion to set a future contract term: the quantity of hours and the types of services for which providers will be compensated.

Lead opinion at 10. This misapprehends the nature of discretion in setting a contract term. It confuses a promisor's reservation of the right to reject or alter a contract based on preference or caprice with setting a term in a mutually agreed upon manner. The latter scenario is what occurred here, as a discussion of the cases cited by the providers and the lead opinion makes clear.

The lead opinion and the providers begin with *Goodyear Tire*, 86 Wn. App. 732. Whiteman was an independent dealer of Goodyear tires. Under the dealership contract, Goodyear reserved the right to sell tires in Whiteman's trade area. *Id.* at 735. When it exercised the right, Whiteman claimed he was eventually forced to shutter his business. In response to a suit brought by Goodyear to recoup amounts due on Whiteman's account, Whiteman counterclaimed for a breach of the duty under the implied covenant of good faith and fair dealing. *Id.*

Importantly, *Goodyear Tire* held that the duty did not apply. This was because the contract expressly allowed Goodyear to sell tires in Whiteman's trade area, with no conditions attached. *Id.* at 741. The contract did not obligate Goodyear to

perform in a discretionary manner. "'[A]s a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms.'" *Id.* at 740 (quoting *Badgett*, 116 Wn.2d at 570).

*Goodyear Tire* explains that "'[t]he covenant may be relied upon only when *the manner of performance under a specific contract term allows for discretion on the part of either party*.'" 86 Wn. App. at 739 (some emphasis added) (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)). This means the implied duty is not triggered where the contract allows for unconditional authority, but it does not mean that a condition of performance (here, production of the client's service plan) necessarily renders the performance "discretionary." This is the mistake in the provider's reasoning, repeated by the lead opinion.[4]

The cases cited by the providers do not demonstrate that a condition of performance is necessarily a discretionary performance. In *Tymshare, Inc. v. Covell*, 234 U.S. App. D.C. 46, 727 F.2d 1145 (1984), the contract at issue reserved to one party the right to change a formula upon which compensation was calculated "'at any time during the quota year within [the party's] *sole discretion*.'" *Id.* at 1148 (emphasis added). Here, DSHS retained no such express right. Its manner of

---

[4]The providers cite to a single instance in which they claim DSHS "acknowledged that the contracts vested it with discretion." Br. of Resp'ts Rekhter, et al. at 25 (quoting Verbatim Report of Proceedings at 1868-69). What the providers quote is argument by DSHS counsel on a CR 50 motion to dismiss the providers' breach of contract claim (a claim that did not survive the jury's review). In the face of DSHS's repeated assertions that the contract did not contain a discretionary term and lacking any citation to testimony from DSHS employees about such discretion, it is unreasonable to conclude DSHS conceded this point.

performance was dictated by the client's service plan, and *it was bound by the hours authorized by the service plan as much as the providers were.* Both parties received what they bargained for: payment authorized by the client service plan.

The providers argue that because DSHS employed a formula that determined the hours of paid care a client would receive, including the adjustments made by the shared living rule (SLR), DSHS retained the discretion to set a contract term. The providers mainly cite to *Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083 (W.D. Wash. 2011) in support of this proposition. The providers treat it as controlling, claiming that under *Aventa*, "[t]he duty of good faith and fair dealing applies to the exercise of discretion in implementing payment formulas." Br. of Resp'ts Rekhter, et al. at 26.

*Aventa* involved an asset purchase agreement executed between an acquired corporation (Aventa) and the acquiring corporation (KCDL) and KCDL's parent company. The agreement promised Aventa, as consideration for the sale of its assets to KCDL, an "'Additional Earnout.'" *Aventa*, 830 F. Supp. 2d at 1090. The additional earnout was a future payment equal to six percent of the assumed equity value of KCDL at a certain future point. *Id.* The assumed equity value was calculated by applying a multiplier to KCDL's trailing 12-month period earnings before interest, taxes, depreciation, and amortization (EBITDA). *Id.* When the additional earnout was eventually calculated, Aventa challenged the EBITDA figure KCDL used. The court concluded that the record on summary judgment contained enough evidence to suggest KCDL may have suppressed its EBITDA calculation

and thus allowed Aventa's claim for breach of the implied duty of good faith and fair dealing to go forward. *Id.* at 1101.

The providers argue that the EBITDA calculation is like DSHS's formula for setting a client's hours of paid care. But their reliance on *Aventa* fails to account for the fact that something more than just a contractual relationship between two parties is at issue here because DSHS has broader obligations as a government agency.[5] Certainly DSHS has an obligation under the contract to pay providers for the number of hours authorized under each client's service plan. But its method for arriving at that number—the Comprehensive Assessment Reporting Evaluation (CARE) tool and the SLR—is not part of the contract. Indeed, the jury rejected any contract claim. The lead opinion claims that I "ignore[ ] the fact that DSHS *created the CARE process using its discretion.*" Lead opinion at 10. In fact, it is the contract itself that "ignores" this. The obligation to determine the hours of care for which a DSHS client is eligible is not part of the contract here and is instead grounded in statute and agency regulations. *See* RCW 74.39.005(2) (requiring DSHS to utilize a uniform system for comprehensively assessing functional disability); ch. 388-106 WAC (rules setting forth the CARE tool formula). The presence of the CARE tool, including the SLR, does not render DSHS's performance under the contract discretionary. The lead opinion suggests DSHS's statutory obligations are irrelevant

---

[5] The lead opinion claims that I would hold DSHS is "exempt from the duty of good faith and fair dealing," lead opinion at 11, because I would distinguish the situation in *Aventa* from the one here. On the contrary, a government agency is certainly bound by good faith and fair dealing. But the CARE tool, and its relationship to the contract at issue here, is qualitatively different from the formula and contract at issue in *Aventa*.

here because the providers seek to enforce a contractual duty around a contractual term. Lead opinion at 14 (arguing that "DSHS confuses *what* is violated with *how* it is violated"). To the contrary, the providers are impermissibly attempting to engraft a contract claim to a statutory obligation using the implied duty of good faith and fair dealing.

Likewise, the providers' reliance on *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748 (8th Cir. 2006), is misplaced. In *Craig*, the parties agreed that the retirement plan administrator had the discretion to interpret the plan terms in calculating the plaintiff's benefits. *Id.* at 751, 752, 754. The Eighth Circuit Court of Appeals explained that this exercise of discretion must be undertaken in good faith, "'a requirement that includes the duty to exercise the discretion reasonably.'" *Id.* at 752 (quoting *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 444 (3d Cir. 2001)). In performing its obligations under the contract, the plan administrator could decide whether to count compensation from a certain period of time, but it could not pick and choose what qualified as "compensation" within that period of time. *Id.* at 753.

Here, DSHS does not enjoy a similar contractual discretion to set hours. On the contrary, the amount paid to providers during the time period in question resulted from an automatic, across-the-board application of the SLR, which was a validly promulgated rule codified in the administrative code. While this court subsequently declared the rule to conflict with federal Medicaid comparability law in *Jenkins v. Department of Social & Health Services*, 160 Wn.2d 287, 157 P.3d 388 (2007), our

-10-

decision did not somehow introduce discretion into DSHS contract performance. One way to better understand why no contractual discretion is involved here is to consider what would have happened had the court in *Jenkins* held that the SLR was consistent with federal law. If DSHS subsequently decided that it wanted to authorize *more* hours for live-in care providers despite the rule, it could not do so on a contract-by-contract basis through an exercise of its discretion. Rather, it would need to amend or repeal the rule through the proper channels, as agency rules are no less binding on DSHS than on those who contract with the agency.

In sum, under the contract here the providers agreed they would receive payment for whatever paid hours of care were authorized by the client service plans. Thus, the manner of performance under the specific contract term did not allow either contracting party to exercise discretion in determining hours. *See Goodyear Tire*, 86 Wn. App. at 739 (explaining that the contract term must allow a party discretion in the manner of performance). No matter how much discretion DSHS may have had in creating the CARE tool, because *the contract* did not vest DSHS with discretion in the performance of the contract terms, application of an implied duty of good faith was not required to ensure the providers received the benefit of their bargain. *See Storek*, 100 Cal. 4th at 61. Indeed, the providers received the benefit of their bargain: payment for the amount of paid care hours authorized by the client's service plan. As a matter of law, a claim for breach of the implied duty of good faith and fair dealing was not available. The judgment for the providers should be reversed.

*2. The lead opinion's discussion of whether an express term of the contract must be breached to trigger the implied duty of good faith and fair dealing is not necessary to the resolution of this case*

The lead opinion opines that the duty of good faith and fair dealing can arise even when there is no breach of an express contract term. Lead opinion at 7. We have never before considered this question, as evidenced by the lead opinion's citation to other jurisdictions in support of its proposition. *Id.* We should be cautious about weighing in on this question today. It concerns an area of significant debate among courts, and the question need not be addressed to resolve this case.

A leading treatise explains that courts are split on whether an express term must be breached before a breach of the implied convenient may be claimed.

> While some courts allow a plaintiff to recover for breach of the duty of good faith and fair dealing even though there has been no breach of a specific contractual clause, provision or duty, perhaps the majority of courts declined to find a breach of the implied covenant of good faith and fair dealing absent breach of an express term of the contract. Under this view, there can be no independent cause of action brought for breach of the covenant of good faith and fair dealing, rather, the claim must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty.

23 WILLISTON & LORD, *supra*, § 63:22, at 514-16 (footnote omitted). We should be prepared to fully consider the conflicting state authorities before committing Washington to a position.

The authorities adopted by the lead opinion fail to set forth a clear line of reasoning for rejecting the necessity of a contract breach. In *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992), the California Supreme Court mused that

requiring a breach of an express contract term to trigger a duty under the implied covenant would seem to make the covenant itself superfluous. Lead opinion at 7-8 (quoting *Carma*, 2 Cal. 4th at 373). But the conduct challenged as a breach of the implied duty in *Carma* "was expressly permitted by the [contract] and was clearly within the parties' reasonable expectations." 2 Cal. 4th at 376. Thus, it was a simple matter for the court to conclude that "such conduct can never violate an implied covenant of good faith and fair dealing." *Id.*

The court in *Carma* did not consider what conduct would breach the implied duty in the absence of a breach of an express contract term. The closest the court came to such an inquiry was its acknowledgment that "[d]ifficulty arises in deciding whether conduct, though not prohibited, is nevertheless contrary to the contract's purpose and the parties' legitimate expectations." *Id.* at 373. In other words, under *Carma*, conduct that is expressly permitted cannot constitute a breach of the implied duty; conduct that is not expressly permitted but also is not prohibited may constitute such a breach.[6]

Under the facts of this case and the posture of the parties' arguments, we do not need to wade into this unsettled area of law. Unlike *Carma*, this case does not present a fact pattern where it is alleged that DSHS engaged in conduct that was neither expressly permitted by the contract nor expressly prohibited. Rather, the

---

[6] The other case the lead opinion relies on for the proposition that breach of an express term is not needed to give rise to the implied duty, *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 766 (7th Cir. 2010), involved an allegation that one party's performance lacked diligence. While this presents a classic example of a breach of the duty under the implied covenant, it is unhelpful here because no one is claiming a lack of diligence by DSHS in performing under the contract.

-13-

providers claim DSHS dealt itself discretionary authority to determine a future term of the contract. *See* Br. of Resp'ts Rekhter, et al. at 24-30. I would conclude that it makes no difference in this case whether an express term must be breached to trigger the implied duty of good faith and save the broader question for another day.

B. The providers cannot prevail on their remaining claims for relief

The providers present a number of alternative theories under which they claim they are entitled to a judgment against DSHS. Because I would hold their contract claim must fail, I address the remaining claims that are not discussed by the lead opinion.[7]

*1. A remedy under* Failor's Pharmacy *is not available here*

The providers argue in the alternative that the judgment against DSHS may be affirmed under this court's decision in *Failor's Pharmacy v. Department of Social & Health Services*, 125 Wn.2d 488, 886 P.2d 147 (1994). Because the lead opinion affirms the jury verdict on the good faith and fair dealing theory, it does not address the providers' *Failor's Pharmacy* argument. I would hold that *Failor's Pharmacy* provides no relief to the providers.

The providers read *Failor's Pharmacy* to instruct that "[a] party contracting with the State is entitled to recover underpayments resulting from an invalid regulation." Br. of Resp'ts Rekhter, et al. at 35. The provider's argue that here, the SLR was invalidated and thus the providers are entitled to recover underpayments. But *Failor's Pharmacy* cannot be read as broadly as the providers propose. There,

---

[7] I agree with the lead opinion's resolution of the providers' wage claims. Lead opinion at 19-21.

the payment schedule at issue was not properly promulgated as a rule according to the Administrative Procedure Act (APA), chapter 34.05 RCW. Hence, this court concluded that the payment schedule was procedurally invalid. *Failor's Pharmacy*, 125 Wn.2d at 497. In turn, it further suggested that the contract at issue was void and recognized that a "party is entitled to recover for losses on the void contract under the doctrine of quantum meruit." *Id.* at 499.[8]

The contract at issue here is not void. Even if *Failor's Pharmacy* could be read as broadly as the providers suggest, it is distinguishable from the present case. No party here has alleged, nor is there any finding, that the contract at issue was void as a result of the invalidation of the SLR. And, the SLR itself was not invalidated as a result of a procedural irregularity. *See Jenkins*, 160 Wn.2d at 300. *Failor's Pharmacy* is not applicable here.[9]

---

[8] The providers are not relying on *Failor's Pharmacy* in support of a quantum meruit claim. *See* Br. of Resp'ts Rekhter, et al. at 35-36 & n.15; Br. of Resp'ts SEIU Healthcare 775NW & Cindy Weens at 45-50.

[9] The providers argue that a "*Failor's Pharmacy* remedy has been applied expressly to other DSHS failures to follow federal law." Br. of Resp'ts Rekhter, et al. at 36 (citing *McGee Guest Home v. Dep't of Soc. & Health Servs.*, 96 Wn. App. 804, 810, 981 P.2d 459 (1999)). *McGee* does not apply the so-called *Failor's Pharmacy* remedy. It distinguished *Failor's Pharmacy*, noting that in *McGee*, the rates at issue did not qualify as rules under the APA. *Id.* at 812. The *McGee* court did not remand for a determination of damages under a theory of quantum meruit, but rather remanded for entry of summary judgment in favor of DSHS. The providers quote language from *McGee* as though it expresses a holding. *See* Br. of Resp'ts Rekhter, et al. at 36. In actuality, the quoted language comes from a portion of *McGee* that is simply relating the facts and the holding of *Failor's Pharmacy*. *McGee*, 96 Wn. App. at 810. As noted, the *McGee* court does not extend *Failor's Pharmacy*.

## 2. *The providers' unjust enrichment claim was properly dismissed under CR 50*

Respondent SEIU and provider Cindy Weens crossappeal in the alternative on the issue of unjust enrichment. The lead opinion need not reach this issue, but because I would reverse the judgment against DSHS, I must address it. I would affirm the trial court's decision to grant DSHS's CR 50 motion for judgment as a matter of law on the unjust enrichment claim. CP at 3447.

As an initial matter, a word of clarification about the nature of this claim is necessary. The trial court pointed out that the providers' complaint sought recovery under theories of unjust enrichment and quantum meruit. CP at 1734. The trial court further explained that the providers filed their complaint before this court's decision in *Young v. Young*, 164 Wn.2d 477, 191 P.3d 1258 (2008), drew a line between an unjust enrichment claim, or a claim premised on a contract implied-in-law, and a quantum meruit claim, or a claim premised on a contract implied-in-fact. CP at 1734; *see Young*, 164 Wn.2d at 483-85 (describing the difference between the theories).[10] In their briefing before this court, the providers make reference to quantum meruit in their heading, Br. of Resp'ts SEIU Healthcare 775NW & Cindy Weens (Br. of SEIU) at 46, but then go on to "request that this Court reverse the trial court's dismissal of the contract implied in law — or unjust enrichment — theory." *Id.* at 47. Hence, what is before us is an unjust enrichment, or contract implied-in-law, claim.

---

[10] *But see* 164 Wn.2d at 498 (Owens, J., dissenting) (arguing that "'quantum meruit'" merely refers to the remedy available in either a claim premised on a contract implied-in-law or a contract implied-in-fact).

As noted, the trial court granted DSHS's motion for judgment as a matter of law under CR 50, following the close of the providers' case in chief. "The standard on a motion for judgment as a matter of law mirrors that of summary judgment." *Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). Review of this issue is de novo, taking the facts in the light most favorable to the nonmoving party.

"A party to a valid express contract is bound by the provisions of that contract, and may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract." *Chandler v. Wash. Toll Bridge Auth.*, 17 Wn.2d 591, 604, 137 P.2d 97 (1943) (reviewing a claim premised on a contract implied-in-law). However, there may be an "'implied contract on a point not covered by an express one.'" *Johnson v. Whitman*, 1 Wn. App. 540, 546, 463 P.2d 207 (1969) (quoting *Lautenbach v. Meredith*, 240 Iowa 166, 35 N.W.2d 870, 871 (1949).[11] Thus, before addressing the elements for an unjust enrichment claim, the question is whether the express contract covers the

---

[11] DSHS quotes *Young* for the proposition that unjust enrichment may only be applied "'*absent any contractual relationship*.'" Appellant's Reply/Cross Response Br. at 52 (quoting *Young*, 164 Wn.2d at 484). But the case to which *Young* cites for this proposition does not suggest that an unjust enrichment claim depends upon the absence of any contractual relationship. *See Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wn. App. 151, 810 P.2d 12 (1991). Moreover, the "absent any contractual relationship" language in *Young* seems at odds with what we have said in cases like *Chandler*. Finally, the "absent any contractual relationship" language was not germane to *Young*'s reasoning or holding, and *Young* is not a case where any express contract was at play. I would hesitate to elevate its "absent any contractual relationship" language to settled legal principle, as DSHS suggests we do.

matter at issue: the total amount of authorized hours DSHS agreed to pay the provider.[12]

The contract clearly contemplates this point. The terms of the contract state that "[t]he monthly payment for all services provided to any client will not exceed the amount authorized in the client's Service Plan." Appellants' Opening Br., App. at 32 (Contract § 4(b)). Per the contract, the providers accept "the DSHS payment amount, together with any client participation amount, as sole and complete payment for the services provided under this Contract." *Id.* (Contract § 4(c)). The contract also states that, "DSHS will only reimburse the Contractor for authorized services provided to clients in accordance with this Contract's Statement of Work and the client's Service Plan." *Id.* (Contract § 4(e)). Finally, the contract states that "DSHS will pay the Contractor only for authorized services provided under this Contract." *Id.* (Contract § 5(b)).

The trial court correctly granted DSHS's CR 50 motion because as a matter of law, a jury could not have found an implied contract on the same matter covered by the express terms of the contract.

In sum, none of the providers' alterative claims prevail, and I would hold there is no basis in law to grant them relief.

---

[12] The providers have not characterized the matter at issue differently. But, they bypass the discussion of whether the issue here is controlled by the express contract and move directly to the elements of unjust enrichment. *See* Br. of SEIU at 48. That move is premature if the express contract covers the point in contention.

## C. The client class claim for monetary judgment should have been dismissed on summary judgment

The final issue to be resolved under my disposition of this case is whether the client class is entitled to a monetary judgment. The lead opinion holds that the client class cannot recover damages along with the providers because this would result in a double recovery. Lead opinion at 18. While I do not necessarily disagree with this analysis, because I would hold the providers are not entitled to recover at all, the double-recovery analysis is inapplicable to my resolution of this case. I would hold that the client class claims should have been dismissed on DSHS's motion for summary judgment.

First, it is important to parse out the nature of the client class claims. As a class, the clients were allowed to join the providers' claim for breach of contract or breach of the implied duty of good faith and fair dealing; as the lead opinion describes it, this was essentially a "pass through" claim. *See* lead opinion at 17-18. Under my resolution of this case, that theory of liability fails, so the client class is no more entitled to a monetary judgment grounded in contract than is the provider class. But the client class also sought recovery based on RCW 34.05.570(2) of the APA, *Jenkins*, and RCW 74.08.080(3).[13] *See* CP at 11-32 (class action complaint). In essence, the client class sought monetary relief via RCW 74.08.080(3) under the

---

[13] The APA generally does not provide for monetary damages. However, the provision of the act codified in RCW 34.05.574(3) allows a court to "award damages, compensation, or ancillary relief only to the extent expressly authorized by another provision of law." RCW 74.08.080(3) provides that on a petition for judicial review of an agency action, "[i]f a decision of the court is made in favor of the appellant, assistance shall be paid from the date of the denial of the application for assistance." Thus, the client class claim for back benefits is premised on RCW 74.08.080(3).

-19-

theory that *Jenkins* had invalidated the SLR. The client class moved for summary judgment on the right to retroactive compensatory relief under RCW 74.08.080(3) as a result of the *Jenkins* decision. CP at 452 (Court's Opinion re Cross Motions for Summ. J.). DSHS cross moved for summary judgment, arguing this claim was time barred as to most members of the class and barred for failure to exhaust administrative remedies as to the rest. The trial court granted summary judgment in favor of the client class on this issue and allowed the claim to proceed. CP at 455-56.

The trial court seemed to assume that because *Jenkins* invalidated the SLR, a claim for retroactive compensation was necessarily proved and the only question left was the measure of damages. CP at 455 (explaining, "I conclude that this court does have jurisdiction to decide the number of service hours wrongfully withheld from an in-home care recipient by application of the SLR and to award judgment to the recipient for retroactive compensation for those hours."). The trial court erred as a matter of law. I would hold that this claim should have been dismissed on summary judgment for the reasons DSHS advanced.[14]

Under RCW 74.08.080(2)(a), individuals must file a challenge to a public assistance determination within 90 days of the determination. Thus, every member

---

[14] The providers claim that DSHS failed to preserve a challenge to the trial court's decision concerning the client class claims. There is no support in the record or briefing for this contention. DSHS's timely notice of appeal clearly encompassed the trial court's ruling on the client class. Its briefing assigns error to challenged portions of the trial court's order concerning the client class, and fully argues those points. Appellants' Opening Br. at 7-8 (assignment of error 4 & 5), 59-74 (argument); Appellants' Reply/Cross Response Br. at 36-49 (argument).

of the client class who failed to do so is barred from recovery in this lawsuit. DSHS recognizes that a small subset of clients within the class had assistance determinations made within the 90 days preceding the filing of this complaint on May 4, 2007. While DSHS appropriately concedes that those clients are therefore not time barred from bringing a claim, those members of the client class are nevertheless barred from recovery because they did not exhaust their administrative remedies as required by RCW 34.05.534.

*1. Statute of limitations and equitable tolling*

Turning first to the statute of limitations questions, the client class argues that the time bar applicable to APA claims has no bearing on claims brought pursuant to RCW 34.05.570. Br. of Resp'ts Rekhter, et al. at 60-61. They suggest a claim to invalidate agency rules can thus be brought at any time under RCW 34.05.542(1) and result in the retroactive restoration of benefits under RCW 74.08.080(3). *Id.* at 59-61. This misapprehends the statutory scheme under the APA and chapter 74.08 RCW. A petition for judicial review may be filed at any time *subject to other requirements of the APA or of another statute.* RCW 34.05.542(1). The requirements of the APA and another statute are fatal to the client class claims here. RCW 74.08.080(2)(a) requires a challenge to a DSHS determination be brought within 90 days of the agency action. RCW 34.05.542(2) requires a petition for judicial review of an agency order be brought within 30 days of service of the final order. Nothing in RCW 74.08.080(3) authorizes retroactive monetary damages for an untimely rule challenge that might have been substantively successful.

Insofar as the client class complaint sought to invalidate the SLR, it asked for prospective invalidation. CP at 32. The trial court appropriately recognized that the client class claim to invalidate the SLR was moot in light of *Jenkins*, but that the class further claimed monetary relief, viz. back-benefits dating to April 2003. *See* CP at 454, 3474-75. Such a claim is fully subject to the statute of limitations that the legislature established to set a limit on the state's exposure to liability. The trial court believed it could equitably toll the limitation provision in RCW 74.08.080(3). 2 Pretrial Verbatim Report of Proceedings (VRP) at 247. As a matter of law, the trial court erred in so holding.[15]

Equitable tolling gives a court power in equity to set aside a judgment, even where the statute of limitations on a challenge to the judgment has run. *Ames v. Dep't of Labor & Indus.*, 176 Wash. 509, 30 P.2d 239 (1934). We have applied the doctrine sparingly because it essentially allows a judicial branch officer to override a legislative determination. *See Leschner v. Dep't of Labor & Indus.*, 27 Wn.2d 911, 185 P.2d 113 (1947). In *Leschner*, we explained:

> [W]e must decline [to apply equitable tolling], for, in our opinion, it would be a dangerous path to follow. Such a rule could only be in disregard of the universal maxim that ignorance of the law excuses no one. What is more important, it would substitute for a positive rule established by the legislature a variable rule of decision based upon individual ideas of justice conceived by administrative officers as well as by the courts.

---

[15] The providers argue that the standard of review to be applied to "the exercise of inherent equitable powers is the highly deferential 'abuse of discretion' standard." Br. of Resp'ts Rekhter, et al. at 63. The providers are mistaken. Whether a statute of limitation applies is a question of law that this court reviews de novo. Even if the providers are correct that the standard of review on this issue is abuse of discretion, the trial court misapplied the law, as I explain below, rendering its decision an abuse of discretion.

27 Wn.2d at 926.[16]

The trial court's oral ruling did not address our cautionary note in *Leschner* that equitable tolling cannot be used to set aside a positive rule established by the legislature. Instead, the trial court concluded that it could excuse any failure to timely challenge DSHS's action because the disabled individuals comprising the client class were vulnerable and acted with diligence in bringing suit after *Jenkins*. *See* 2 Pretrial VRP at 244-45. This is not a sufficient basis to support equitable tolling.

Certainly our case law has recognized that some degree of vulnerability may allow for relief through equitable tolling. *See Ames*, 176 Wash. 509 (plaintiff adjudicated insane); *Rodriguez v. Dep't of Labor & Indus.*, 85 Wn.2d 949, 540 P.2d 1359 (1975) (plaintiff extremely illiterate and did not speak English). But while vulnerability may be a necessary condition, it is not alone sufficient. All of DSHS's clients are, by definition, vulnerable. The legislature nonetheless established a limitation period for challenging DSHS actions. Recognizing the need to respect legislative choices, this court has required a particularized showing that applying a

---

[16] Since *Leschner*, we have suggested that in order to avail one's self of equitable tolling, the party seeking to circumvent a statute of limitations must show both an incompetency that prevented knowledge of the adverse determination and "some misconduct on the part of the [agency] in communicating its order to the claimant." *Kingery v. Dep't of Labor & Indus.*, 132 Wn.2d 162, 174, 937 P.2d 565 (1997). But *Kingery* was a plurality, and there is no holding from this court limiting the application of equitable tolling to scenarios in which these two criteria were present. Appellants' Opening Br. at 68-69; *see Kingery*, 132 Wn.2d at 179 (Alexander, J., dissenting) (explaining that while he agreed that equitable tolling allows a court to intervene to "protect those who are unable to protect themselves," he would not limit it to incompetent persons).

limitation period to the particular plaintiff would work an injustice. *See Ames*, 176 Wash. at 510 (applying equitable tolling where plaintiff did not receive notice of the action); *Rodriguez*, 85 Wn.2d at 950 (applying equitable tolling where plaintiff received notice but could not read it and had no interpreter); *Kingery v. Dep't of Labor & Indus.*, 132 Wn.2d 162, 174, 937 P.2d 565 (1997) (plurality explaining that equitable tolling applies where some infirmity prevents the plaintiff from understanding the action); *id.* at 179 (Alexander, J., dissenting) (explaining majority view that equitable tolling would apply if plaintiffs missed a statute of limitations due to "circumstances largely beyond their control"); *Leschner*, 27 Wn.2d at 927 (declining to apply equitable tolling where plaintiff was appropriately notified of action, though falsely told by doctor that he had submitted a claim, and pursued no further action despite no communication from the department for four years).

Here, there is no showing as to how the vulnerability of the members of the client class prevented them from timely challenging the actions taken by DSHS. Use of the SLR was spelled out in the Washington Administrative Code. Former WAC 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 (2003); former WAC 388-72A-0095(c) (2003); former WAC 388-106-0130(3)(b) (2005); *see Leschner*, 27 Wn.2d at 926 (noting that ignorance of the law is no excuse). And, clients received notice whenever their benefits changed, either by reduction or increase. The clients argue that "DSHS notices to Clients during its operation of the SLR provided incorrect and affirmatively misleading information about the paid care for which the Clients were eligible and the SLR's reduction of those benefits." Br. of Resp'ts Rekhter, et al. at 66. The trial court made no such

finding, nor did it even mention any deficiencies in DSHS's notices to the clients. The providers' citations to the record in support of the alleged misleading information provided by DSHS are not convincing. It is true, as the providers argue, that some planned action notices alerted clients that their hours would be reduced without specifically explaining whether the reduction was a result of the SLR. *Id.* (citing CP at 1133). But it is difficult to see what difference that information would have made to the decision to appeal a reduction or termination of hours. The clients were told of the very reduction in benefits they now seek to have restored and were clearly advised how to and by when to appeal. *See* CP at 1133-35. Indeed, the client class does not show how the notices its members received differed from those other clients received during the relevant time period. The fact that the clients in *Jenkins* preserved and brought a timely challenge to the SLR demonstrates that the planned action notices were adequate.

Perhaps anticipating this conclusion, the client class argues that the action notices were categorically deficient in that they failed to disclose that the "right to an administrative appeal . . . was illusory because there was no jurisdiction over appeals of the SLR." Br. of Resp'ts Rekhter, et al. at 66-67. The problem with this view is that it misunderstands the administrative process. Although an administrative law judge cannot invalidate an agency rule in the course of determining a benefits challenge, the APA allows for the joining of a rule challenge to an administrative appeal, as the plaintiffs' reliance on RCW 34.05.570 acknowledges. Indeed, this was the path followed by the plaintiffs in *Jenkins*.

Moreover, an appeal may be filed directly in superior court where it would be futile to exhaust administrative remedies. RCW 34.05.534(3). It proves too much to say that DSHS's system of administrative appeals—mandated under the APA—is itself a basis to grant equitable tolling. If this were true, the limitation period under the APA would have no effect. In sum, the trial court erred when it concluded that the vulnerability of DSHS clients, and the nature of the administrative appeal process, justified equitable tolling. Such a conclusion would completely eviscerate the statute of limitations under RCW 74.08.080(2)(a) for each and every DSHS client.

Moreover, the trial court was incorrect that the clients acted with diligence, thus justifying the imposition of equitable tolling. The trial court reasoned that the clients and providers filed this complaint the day after *Jenkins* was decided. But it is difficult to understand how this constitutes diligence, other than diligence in seeking a retroactive application of the decision in *Jenkins*. As noted, there is no basis for such relief. The client class complaint appears to recognize as much because it frames its request for back benefits as an action under the APA and RCW 74.08.080, while (unnecessarily) asking for "prospective" invalidation of the SLR. CP at 31. While the plaintiffs are correct that retroactive relief is available in an action challenging the validity of an agency rule, the law also requires that such an action be timely.[17] The majority of the clients in the class cannot avail themselves

---

[17] The client class claims that in *Berry v. Burdman*, 93 Wn.2d 17, 604 P.2d 1288 (1980), plaintiff Genevieve Gallow was awarded retroactive relief despite having failed to file a timely petition for review of the agency action. Br. of Resp'ts Rekhter, et al. at 61 n.25 (citing CP at 3664). They cite to the complaint in the trial record in *Berry*, which states that plaintiff Gallow was notified of the agency action of September 29, 1976 and requested an administrative hearing on October 4, 1976. CP at 3664. This does not appear

of a retroactive monetary recovery under *Jenkins* because their claims are barred by the statute of limitations. As to the subset of clients who filed timely challenges to agency action, their request for a monetary award is barred because they failed to exhaust their administrative remedies, and I turn now to that question.

### 2. Exhaustion of remedies

Some members of the client class challenge adverse decisions made within 90 days of the date this action was filed, May 4, 2007, thereby satisfying the statute of limitations in RCW 74.08.080(2)(a). However, they must still demonstrate that the court can excuse their failure to exhaust their administrative remedies. *See* RCW 34.05.534 (barring judicial review if administrative remedies are not exhausted). Once *Jenkins* was decided on May 3, 2007, claimants had an administrative remedy: the SLR was invalid and a challenge to its imposition would have resulted in a readjustment of hours. There can be no argument that seeking administrative relief would have been futile at this juncture, yet futility is the only argument the client class advances for not requiring exhaustion. Because this argument fails, I would hold that this subset of class plaintiffs cannot recover in this action.[18]

---

to support relief without regard to the timeliness of a petition; at any rate, the opinion in *Berry* does not itself provide support for the view that a court may set aside a statute of limitations and award retroactive monetary relief.

[18] In concluding that administrative actions would have been futile, the trial court noted the large number of individuals who would have had to file administrative challenges. *See, e.g.*, 2 Pretrial VRP at 243, 247. To the extent the judge was suggesting the large number of claimants would have made an administrative appeal futile, there is not support for such a conclusion in the APA. A class is not excused from exhausting administrative remedies.

## CONCLUSION

The implied duty of good faith and fair dealing arises only where the manner of performance leaves a contracting party discretion in fulfilling its obligations under the contract. Here, DSHS's performance was not conditioned on an act of discretion but governed by the statutes, rules, and regulations the agency was bound to follow. As a matter of law, there was no discretion implicating the implied duty of good faith and fair dealing, and the providers' claim premised on this theory should have been dismissed. As the providers remaining claims are not viable, I would reverse the judgment in their favor. I would also reverse the order granting summary judgment on the client class claims, most of which are barred by the applicable statute of limitations and the remainder of which are barred by the failure to exhaust administrative remedies. Accordingly, I dissent.

Stephen, J.

Madsen, C.J.

Fairhurst, J.