IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JOEL MILLAR, | No. 85876-9-I |
| Appellant. | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| ANAKKA HARTWELL, a Washington resident, | |
| Defendant, | |
| LIBERTY INSURANCE CORPORATION, a foreign insurance corporation; and TEMPORARY HOUSING, INC. d/b/a CRS TEMPORARY HOUSING, a foreign entity, | |
| Respondents. | |

CHUNG, J. — Liberty Insurance provides home insurance policies that include coverage for temporary housing after a covered loss. Temporary Housing, Inc. d/b/a CRS Temporary Housing ("THI" or "CRS") assists Liberty's insureds in locating such housing. THI arranged and paid for temporary housing for one of Liberty's policyholders, Anakka Hartwell, in a house owned by Joel Millar. After Hartwell's coverage ended, THI stopped paying Millar. Hartwell remained on the property without paying rent, and Millar filed suit against THI, Liberty, and Hartwell, raising claims for declaratory relief, breach of contract,

breach of the duty of good faith and fair dealing, intentional or negligent misrepresentation, violation of the Washington Consumer Protection Act (CPA),[1] and equitable estoppel. The trial court granted THI and Liberty's joint motion for summary judgment dismissing the claims, and Millar appealed. We affirm.

FACTS

In September 2018, a serious water leak was discovered in Anakka Hartwell's home, prompting her to file a claim with her insurance company, Liberty, seeking Additional Living Expense (ALE) coverage for temporary housing during the time her home was to be repaired. Liberty has a Master Services Agreement with THI pursuant to which THI assists Liberty's policyholders in locating temporary alternative housing following a covered event. THI does not discuss coverage issues with any policyholder directly and discusses the need for continued housing directly with the insurer. THI also generally engages in direct communications with potential landlords, limited to confirming specific residency requirements. THI and Hartwell entered into an agreement that appointed THI "to serve as facilitator and intermediary for [Hartwell's] temporary housing needs."

Between October 2018 and March 2019, THI assisted in securing temporary housing placements for Hartwell, including in hotels and in a townhome. In late March of 2019, THI contacted Joel Millar regarding a house he had listed through the short-term rental service VRBO. THI's employee Manny Martinez asked Millar to communicate off the VRBO platform, and Millar agreed.

_____

[1] Chapter 19.86 RCW.

2

Martinez explained THI was seeking temporary housing for their client, Hartwell, while her house was being repaired, and Millar agreed to lease his property to Hartwell. This arrangement was reflected in the Temporary Housing Confirmation ("Confirmation"), which Millar and Hartwell signed with electronic signatures on April 2 and April 3, respectively.

The Confirmation states the "Estimated initial lease term" would be from April 1, 2019 to June 30, 2019, with an option to renew on a month-to-month basis. Additionally, under the section heading "Terms and Conditions," it stated a "20-day notice will be given 20 days prior to the anticipated move-out date. Notice will be submitted via Email to [blank]. CRS [THI] will be contacted before re-renting property. Extensions are approved in 20 day increments."

On May 29, 2019, THI employee Dulce Cruz sent Millar a request for an extension on a month-to-month basis at the current rental rate. Millar responded the next day and confirmed Hartwell could stay at the same rate. THI then responded it would provide Millar "with a 30 day notice to vacate once we are sure our family is ready to move back home."[2] On September 25, 2019, THI requested an additional extension to November 8, 2019. Millar again approved the extension.

By October 4, 2019, THI confirmed with Liberty that no additional extensions would be granted. Accordingly, THI provided a notice to Millar via e-mail and letter dated October 13, 2019, that Hartwell was to vacate the property by November 8, 2019, and requested a refund of the security deposit.

---

[2] Although the Confirmation references only a 20-day notice to vacate, Cruz's e-mail references a "30-day notice," and the parties thereafter continue to refer to a 30-day notice.

3

On October 31, 2019, Millar e-mailed THI requesting clarification on the most recent check he had received from them. He also shared that he "received a notice from the tenant, [] Hartwell, that she will need to occupy the house until at least 11/20," and he "wanted to be certain [THI] [was] aware of this alteration to [Hartwell's] schedule so that [they] may take [] steps" regarding the rent payment. That same day, THI clarified the check Millar received was intended to cover November 1-8, 2019. THI also relayed to Millar the following:

> The tenant has requested an extension past 11/8 but her insurance has denied the request. If she does stay past 11/8, you will have to seek payment for those days from her. I will reach out to her insurance adjuster on Monday since she is out of the office, and check if the request has been approved or still denied and I will keep you updated.
>
> As of right now, we can only pay for the 8 days in November.

THI then stopped making rental payments to Millar. On November 12, 2019, THI again requested a refund of the security deposit from Millar and stated "[t]he lease terminated on 11/8/2019." On November 20, 2019, Millar wrote THI,

> I am told by the tenants that their house is still not ready for occupancy and that the insurance company will be issuing a check this week to pay for the rent through at least the end of this month. Do you have any additional information regarding a payment for through November[?]

THI responded it had "not heard from the insurance and the tenant has been informed by the insurance, that any days they stay past 11 8 2019 they will have to pay [Millar] directly."

Hartwell did not vacate by November 8, 2019 and instead remained on the property until December 2022. While Hartwell made some rent payments, the bulk of the rent after THI's last payment remained unpaid.

4

On August 5, 2022, Millar filed suit against Hartwell, Liberty, and THI, seeking to recover unpaid rent incurred by Hartwell beginning November 9, 2019. Liberty filed a CR 12(b)(6) motion to dismiss, and THI filed a CR 56 motion for summary judgment. The court denied Liberty's motion to dismiss and denied THI's CR 56 motion without prejudice. In its order denying THI's motion, the court ruled that on the initial question of whether there was a lease between THI and Millar, "it is not a lease." However, it also stated that while not a lease, the Confirmation was "odd" and there were genuine issues of fact as to whether it was an agreement between Millar and CRS to pay, or facilitate payment of, Hartwell's rent. Thus, the court noted, "defendants may file again after deposing Mr. Millar." Further, the court dismissed Millar's claim against THI and Liberty for negligent infliction of emotional distress, as it was based on Hartwell's behavior, not that of CRS or Liberty. Finally, the court noted that with regard to Liberty's motion to dismiss, "the real party in interest has not been pled (the owner of the property) and there are not sufficient facts to plead the emotional distress claim." Therefore, it dismissed the emotional distress claim without prejudice and ordered that "the complaint must be amended within ten days to either plead sufficient facts and to add the real party in interest." THI moved for reconsideration. Upon reconsideration, the court again denied the motion, stating, "The court agrees that the best course is to await the next summary judgment motion after additional discovery."

In December 2022, Millar filed an amended complaint omitting the emotional distress claims and pleading six causes of action: (1) declaratory

5

judgment, (2) breach of contract, (3) violation of contractual good faith and fair dealing, (4) intentional or negligent misrepresentation, (5) violation of the Washington Consumer Protection Act (CPA), and (6) promissory and/or equitable estoppel. After further discovery, THI and Liberty filed a joint motion for summary judgment. The court granted the motion and dismissed all claims against Liberty and THI with prejudice. The court reasoned as follows:

> [E]ven [Millar's] declaration filed in opposition to this motion contains, at best, vague statements that Millar is relying upon Hartwell's assurances that the insurance will pay. . . . Assuming there was a contract between CRS and Millar that the Court ruled was terminated by November, there is no evidence here extending it – just a tenant describing efforts to get money from her insurance company.

Millar timely filed a notice of appeal of the order dismissing his claims against THI and Liberty. Subsequently, Millar dismissed his claims against Hartwell without prejudice.[3]

## DISCUSSION

Millar appeals the order granting summary judgment. He contends that there are genuine issues of material fact as to whether there is a contract between him and THI that permitted THI to terminate Hartwell's tenancy unilaterally, and whether THI's cessation of rent payments constituted a breach of contract. Relatedly, he argues that there are genuine issues of material fact as to whether THI breached the duty of good faith and fair dealing. He also asserts his claims for fraud and negligent misrepresentation, violation of the CPA, and

---

[3] Hartwell is not a party to this appeal.

equitable estoppel,[4] premised on the same alleged misrepresentations and omissions, were improperly dismissed.

We review summary judgment orders de novo. Gardens Condo. v. Farmers Ins. Exch., 2 Wn.3d 832, 838, 544 P.3d 499 (2024). Accordingly, the appellate court engages in the same inquiry as the trial court. Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 216, 522 P.3d 80 (2022).

"Summary judgment is properly granted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " Haley, 25 Wn. App. 2d at 216 (quoting CR 56(c)). "A 'material fact' is a fact upon which the outcome of the litigation depends, in whole or in part." Morris v. McNicol, 83 Wn.2d 491, 494, 519 P.2d 7 (1974) (quoting CR 56(c)). On summary judgment, the court "must consider all evidence in favor of the nonmoving party." Keck v. Collins, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015). "[T]he trial court may not weigh the evidence, assess credibility, consider the likelihood that the evidence will prove true, or otherwise resolve issues of material fact." Haley, 25 Wn. App. 2d at 217. " 'The function of a summary judgment proceeding, . . . is to determine whether or not a genuine issue of fact exists, not to determine issues of fact.' " Id. (quoting State ex rel. Zempel v. Twitchell, 59 Wn.2d 419, 425, 367 P.2d 985 (1962)).

---

[4] While Millar's briefing references promissory estoppel in multiple places, his arguments focus only on his equitable estoppel claim. Because he fails to present argument or authority on promissory estoppel in his opening brief, the argument is waived. See Smith v. King, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986) ("The basis of this assignment of error is neither stated nor argued, nor is any legal authority bearing on that issue cited. Accordingly, we consider this assignment of error waived.").

A party that moves for summary judgment has the initial burden of showing the absence of an issue of material fact. Young v. Key Pharms., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). A defendant moving for summary judgment can submit affidavits to demonstrate that no issue of material fact exists or can demonstrate to the trial court that the "plaintiff lacks competent evidence to support an essential element of [their] case." Guile v. Ballard Community Hosp., 70 Wn. App. 18, 23, 851 P.2d 689 (1993) (citing Young, 112 Wn.2d at 225 & n.1). When the defendant-movant satisfies the initial burden, the burden then shifts to the plaintiff. Id. The plaintiff must sufficiently demonstrate "the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." Id. The failure to make such a showing will result in the trial court granting summary judgment. Id.

I.      Contract Claim

Millar acknowledges that any lease agreement is between him and Hartwell, not Liberty or THI.[5] Nevertheless, Millar claims that, based on representations from THI, THI and Millar had an agreement that THI would pay Hartwell's rent until her home was repaired. Millar claims that by terminating the rental agreement before Hartwell's home repairs were complete and not paying Hartwell's rent after November 8, THI and Liberty breached this agreement. Specifically, Millar argues "genuine issues of material fact remain on the issue of

---

[5] The Confirmation document identifies the tenant as Hartwell. At oral argument Millar asserted he never claimed there was a lease between himself and THI or Liberty, but rather, that there was an "agreement." Wash. Ct. of Appeals oral argument, Millar v. Hartwell, No. 85876-9-I (January 14, 2025), at 5 min., 23 sec. through 5 min., 53 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025011238/?eventID=2025011238.

whether THI could unilaterally terminate the agreement to pay while Hartwell remained a tenant in Millar's rental" as well as regarding whether THI could terminate the agreement without Hartwell's consent.

THI and Liberty respond that the Confirmation was not a contract between THI or Liberty[6] and Millar, but rather, a term sheet contemplating a lease between Millar and Hartwell, and if there was a contract, there was no breach. We agree with THI and Liberty that there is no genuine issue of material fact here as to whether they breached a contract with Millar by ceasing to pay Hartwell's rent after November 8.

"To establish a claim for breach of contract, a plaintiff must show (1) a valid contract, (2) a breach of duty arising under that contract, and (3) the resulting damage." Silvey v. Numerica Credit Union, 23 Wn. App. 2d 535, 544, 519 P.3d 920 (2022). Additionally, "[a] valid contract requires the parties to objectively manifest their mutual assent to all material terms of the agreement." P.E. Sys., LLC v. CPI Corp., 176 Wn.2d 198, 209, 289 P.3d 638 (2012). "Moreover, the terms assented to must be sufficiently definite." Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 178, 94 P.3d 945 (2004). "Washington follows the 'objective manifestation theory' of contract interpretation, under which the focus is on the reasonable meaning of the contract language to determine the parties' intent." Silvey, 23 Wn. App. 2d at 545 (citing Hearst Commc'ns, Inc. v.

---

[6] Liberty also argues that Millar cannot claim that a failure to pay Hartwell's rent was a breach of the insurance contract because Millar is not a party to Hartwell's insurance policy. However, Millar does not claim a direct relationship or contract with Liberty based on Hartwell's insurance policy. Rather, he claims that Liberty is liable because THI was acting as Liberty's agent in entering into an agreement with him.

Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005)). Generally, we give "words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent," and "we view the contract as a whole, interpreting particular language in the context of other contract provisions." Id.

Millar contends that the Confirmation required him to undertake acts or promises and makes THI responsible for the payment of rent, deposits, and fees, resulting in a bargained-for exchange of promises and acts that constitute consideration. He points to what he characterizes as multiple references in the Confirmation to "promised performances . . . between only Millar and [THI]." For example, the Confirmation states, "Lease shall automatically renew on a month-to-month basis . . . with *CRS Temporary Housing* having first right of refusal." (Emphasis added.) Further, "Lessor understands and agrees that all deposits, overpayments and/or credits *will be returned to CRS* upon the expiration of the lease term. . . ." (Emphasis added.) And, Millar points out, although the Confirmation contains electronic signatures from Millar and Hartwell, it is on CRS letterhead.[7]

But even if the Confirmation creates enforceable obligations on THI's part, Millar has provided no evidence that THI or Liberty agreed to pay Hartwell's rent

---

[7] Millar claims he never received the final countersigned document, despite requesting the updated document. Millar testified the version without Hartwell's signature was the only version he ever knew existed and, thus, he believed the agreement was between himself and CRS/THI. However, the countersigned version contains the "sign agreement" history, indicating this version was sent to "all eligible parties." In her declaration attaching the signed Confirmation, THI counsel describes the document as "a lease" between Millar and Hartwell, but does not explain the Adobe Sign Agreement history. But even without an explanation of the electronic signature process, Millar's claim that he understood differently does not contradict the unchallenged documentary evidence that he and Hartwell signed the Confirmation.

indefinitely. Rather, the Confirmation requires the insurance carrier, Liberty, to approve the terms of a lease and requires THI to "work to obtain approval for the costs and terms listed within this confirmation." The Confirmation specifies that THI's obligations are separate from the lease:

> Once signed, CRS will work to obtain approval for the costs and terms listed within this confirmation. CRS does not authorize the signing of a lease prior to these terms being formally approved by the insurance carrier. *The lease agreement is strictly between the lessor and the lessee and CRS is not a party to the lease.* Therefore, CRS will not be a party to any dispute arising from this lease. *Once the lease is executed, please forward a signed copy to CRS* to avoid any disruption in rental payments.

(Emphasis added.) The Confirmation characterizes Millar's relationship to THI as a "vendor."[8]

The Confirmation sets forth an initial lease term from "4/1/2019 - 6/30/2019" and states that the agreement "shall automatically renew on a month-to-month basis at the same rate . . . ." Millar notes that the Confirmation does not contain any specific termination provision, but instead only that "a 20-day notice will be given 20 days prior to the anticipated move-out date." Because of this absence, he contends THI/Liberty had no "clear right to terminate payments" while Hartwell remained a tenant. Thus, he argues, the contract contains ambiguity that "either creates an issue of fact allowing for the introduction of extrinsic evidence for resolution by the jury or, if the ambiguity cannot be

---

[8] The Confirmation states that "CRS is required by law to maintain accurate records on Tax Identification Numbers (TIN), Employer Identification Numbers (EIN) and Social Security Numbers (SSN) for all vendors paid during the year," the vendor must supply "the correct information" or be subject to a tax withholding and IRS penalties.

resolved . . . , it should be construed against THI as the drafter of the agreement."

However, "[i]f the language is clear and unambiguous, the court must enforce the contract as written; it may not modify the contract or create ambiguity where none exists." Lehrer v. Dep't of Soc. & Health Servs., 101 Wn. App. 509, 515-16, 5 P.3d 722 (2000) (citing McDonald v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 733, 837 P.2d 1000 (1992)). Although "[a]n ambiguous provision is one fairly susceptible to two different, reasonable interpretations[,] . . . [a] contract is not ambiguous simply because the parties suggest opposing meanings." Silvey, 23 Wn. App. 2d at 545. Here, Millar does not identify any provision in the Confirmation that states, or even suggests, that rent will be paid as long as Hartwell remains a tenant or until her home was repaired. Nor does the Confirmation assign Millar's ALE benefits—or her right to pursue such benefits—to Millar. There is no ambiguity in the Confirmation that creates a triable issue of material fact. And to the extent the Confirmation required a 20-day notice for termination, THI complied by sending Millar notice of an anticipated move-out date of November 8, 2019 on October 13, more than 20 days in advance.[9]

---

[9] Millar further contends there is a genuine issue of material fact concerning whether "the termination of payment was reasonable under the facts and circumstances," relying on Cascade Auto Glass, Inc. v. Progressive Casualty Ins. Co., 135 Wn. App. 760, 767, 145 P.3d 1253 (2006). The court in Cascade considered a contract which was silent "as to [the] duration and manner of termination" of a pricing agreement. Id. at 766. To resolve the issue, the court stated that reasonable notice "depends on the facts and circumstances of each case." Id. Cascade Auto Glass is inapposite here, as the Confirmation does not contemplate "reasonable notice," but specifies a 20-day notice to vacate. It is undisputed that THI provided more than 20 days' notice via e-mail to Millar and that he received it.

Millar nevertheless argues there is a "genuine issue of material fact whether THI could terminate the written agreement with Millar absent Hartwell's consent when THI was acting as a dual agent for both Liberty and Hartwell under separate agreements."[10] Regardless of any "dual agency," THI's relationship with Liberty is not relevant to whether the Confirmation required Hartwell's consent to provide notice of an anticipated move-out date, which it did not. Indeed, it is undisputed that in a separate agreement between THI and Hartwell, Hartwell authorized THI to act as "facilitator and intermediary" for her temporary housing needs as a policyholder, and to "process directly for [Hartwell]" any applicable property rental payments "on behalf of [Hartwell] as approved by [Hartwell's] insurer." In the same agreement, Hartwell acknowledged that "CRS will act as [her] agent for the sole purpose of renting such Leased Property." This express language allowed THI to act as Hartwell's agent regarding the lease, and neither the Hartwell-THI agreement nor the Confirmation required THI to obtain Hartwell's consent to terminate the lease. Thus, there is no genuine issue of material fact as to whether pursuant to the Confirmation, THI required Hartwell's consent to provide Millar with a notice of her anticipated move-out date and, relatedly, that it was making its last payment for her rent.

---

[10] For purposes of its motion to dismiss, "Liberty accept[ed] as true that THI is an agent of Liberty." There is no agreement establishing this agency relationship in the record. To support its argument that THI is Liberty's agent and cannot serve as a "dual agent," Millar includes an unpublished decision involving THI in his declaration, Pickett v. Temporary Housing, Inc., where, on a CR 12(b)(6) motion to dismiss, the court determined, "Plaintiff's allegations plausibly support a finding that Defendant [THI] is an adjuster at this stage of the proceedings," and, thus, declined to dismiss the plaintiffs' tort claims against THI/CRS. No. 2:21-CV-0174-TOR, 2022 WL 125305, at *3 (E.D. Wash. Jan. 12, 2022) (unpublished). But this case is inapposite to the issue here, whether THI breached a contract with Millar, a landlord for a policyholder-tenant.

In sum, the Confirmation did not establish an agreement that THI would pay Millar the rent for Hartwell's tenancy in perpetuity. THI provided 20 days' notice of Hartwell's anticipated move-out date, as contemplated in the Confirmation, and it did not need Hartwell's consent to do so. Thus, the court did not err by granting summary judgment dismissing Millar's breach of contract claim against THI and Liberty.

Millar's claim for breach of the implied duty of good faith and fair dealing also fails, as it relies on the breach of contract claim. Millar alleges Liberty and THI breached their duty of good faith and fair dealing "by terminating rental payments under the Temporary Housing Confirmation when they knew Hartwell's insured home was not ready for occupancy, of which Hartwell's over-stay . . . was a natural and foreseeable consequence." "[T]he implied covenant of good faith and fair dealing cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties." Rekhter v. Dep't of Soc. & Health Servs., 180 Wn.2d 102, 112-13, 323 P.3d 1036 (2014) (plurality opinion); see also Silvey, 23 Wn. App. 2d at 556. Instead, " 'the duty [of good faith and fair dealing] arises only in connection with terms agreed to by the parties.' " Rekhter, 180 Wn.2d at 113 (quoting Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991)). Thus, once THI gave Millar the 20-day notice pursuant to the Confirmation, it had no further obligation to pay, regardless of whether Hartwell's home was ready for occupancy. To conclude otherwise would inappropriately "impose a free-floating obligation" onto THI that was not in

any contract. The court did not err by dismissing Millar's claim for breach of the duty of good faith and fair dealing.[11]

## II. Dismissal of Other Claims

Millar also brought claims for intentional or negligent misrepresentation, violation of the CPA, and equitable estoppel. While each claim has different elements, each is ultimately premised on the same allegations underlying his breach of contract claim, i.e., that THI/Liberty had an obligation to continue paying Hartwell's rent beyond November 8, 2019. For his intentional or negligent misrepresentation claims, Millar asserts there were "multiple express assurances provided by THI that it would pay Hartwell's rent at Millar's rental until her own home was ready for occupancy, that THI knew or should have known those representations were false, [and] that THI intended Millar to rely on those representations, which he reasonably did, to his loss." Millar's CPA claim alleges that THI and Liberty "committed unfair or deceptive business practices, that those practices impacted the public interest, and that those practices caused injury when THI abruptly cut off rental payments while Hartwell remained a tenant in Millar's rental house, contrary to the repeated prior assurances of THI."[12] And for his equitable estoppel claim, Millar repeats his core argument that "repeated

---

[11] Millar also requested a declaratory judgment "that the agreement executed by Millar on April 2, 2019, constitutes a valid and enforceable contract between, inter alia, Plaintiff Millar and Defendants THI and Liberty." He argues on appeal that "the court did not explicitly rule on the declaratory relief other than granting the entire motion for summary judgment dismissal." Given our disposition of the breach of contract claim, we conclude the court did not err by dismissing Millar's claim for declaratory relief.

[12] Millar also references his complaint to support his argument that THI failed to disclose "the substantial risk to him that Liberty might discontinue rental payments while Hartwell remained a tenant at the Millar Premises," and that this omission constitutes "unfair and deceptive practice in violation of the Washington Consumer Protection Act." However, allegations in the complaint are not evidence and, thus, are inadequate to create a genuine issue of material fact.

assurances of THI representatives that a 'notice to vacate' would be provided to Millar only when Hartwell's own house was ready for her, and that the insurer (Liberty) would pay the rent through THI."

Each of these non-contractual claims requires proof that THI/Liberty falsely represented to Millar that it had such an obligation or failed to inform him that it did not have such an obligation. Both intentional and negligent misrepresentation claims require communication of information that is false.[13] Similarly, a plaintiff in a CPA claim must prove an unfair or deceptive act or practice. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986).[14] And to prove equitable estoppel, a plaintiff must show "(1) an admission, statement, or act inconsistent with a claim

---

[13] Intentional misrepresentation, or fraud, requires proof of nine elements:

> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon the representation; and (9) damages suffered by the plaintiff.

West Coast, Inc. v. Snohomish County, 112 Wn. App. 200, 206, 48 P.3d 997 (2002) (citing Stiley v. Block, 130 Wn.2d 486, 505, 925 P.2d 194 (1996)). For negligent misrepresentation, a plaintiff must prove that (1) the defendant supplied information for the guidance of others in their business transactions that was false; (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in business transactions; (3) the defendant was negligent in obtaining or communicating false information; (4) the plaintiff relied on the false information supplied by the defendant; (5) the plaintiff's reliance on the false information supplied by the defendant was justified (that is, that reliance was reasonable under the surrounding circumstances); and (6) the false information was the proximate cause of damages to the plaintiff. Lawyers Title Ins. Corp. v. Baik, 147 Wn.2d 536, 545, 55 P.3d 619 (2002).

[14] To prove a CPA claim, a plaintiff "must establish five distinct elements: (1) unfair or deceptive act or practice, (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." Hangman Ridge, 105 Wn.2d at 780. Under the CPA, "[d]eception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer." Eng v. Specialized Loan Servicing, 20 Wn. App. 2d 435, 445-46, 500 P.3d 171 (2021) (quoting Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 50, 204 P.3d 885 (2009)). "A plaintiff need not show the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public." Young v. Toyota Motor Sales, U.S.A., 196 Wn.2d 310, 317, 472 P.3d 990 (2020).

afterward asserted; (2) action by another in reasonable reliance on that act, statement, or admission; and (3) injury to the party who relied if the court allows the first party to contradict or repudiate the prior act, statement, or admission." Peterson v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002).

Millar does not provide evidence creating a genuine issue of fact as to whether THI provided him with false or inaccurate information that a reasonable person would rely on as a promise to pay rent beyond the notice to vacate.

Millar points to e-mail exchanges between himself and THI to establish that THI either actively misrepresented a continuing promise to pay or omitted important information. He highlights the initial e-mail communications in which THI representative Cruz clarifies that she will e-mail a notice to vacate to Millar if Hartwell is "on track for move out or if more time will be needed." Millar also refers to a string of e-mails between himself and Cruz, in which she requested consecutive extensions in conjunction with statements that repairs to the Hartwell home were not completed. Millar testified that after receiving the e-mails about the extensions and then the "30-day notice" from Cruz, "[b]ased on [this notice], [he] believed Hartwell's house was ready for move-in, and she was actually vacating my property."

Although Millar claims Cruz's e-mails to him between October and November 2019 were separate representations concerning the continuation of rent payments by THI, the record does not reflect such promises. On October 13, 2019, THI issued the notice to vacate and requested the return of the security deposit. On October 31, 2019, Millar requested clarification on a check THI sent

to him and rent payments beyond November 8, as Hartwell intended to stay until at least November 20, 12 days after the intended vacate date. That same day, Cruz responded:

> The check you just received is for the dates of November 1st-8th 2019.
>
> The tenant has requested an extension past 11 8 but her insurance has denied the request. If she does stay past 11 8, you will have to seek payment for those days from her. I will reach out to her insurance adjuster on Monday since she is out of the office, and check if the request has been approved or still denied and I will keep you updated.
>
> As of right now, *we can only pay for the 8 days in November.* Please let me know if you have any questions.

(Emphasis added.) Millar acknowledges that Cruz's response made it clear that Hartwell should pay him rent directly after November 8, but claims he also understood the e-mail to be an assurance THI was separately "seeking an extension of rental benefits from the insurance company." Millar also referenced Hartwell's assurances that the "30-day notice [to vacate] was a mistake" and that the insurance company would issue him a check. However, on November 12, THI confirmed with Millar "the lease terminated on 11/8/2019" and reiterated its request for the security deposit. And when Millar followed up on November 20 asking if THI had heard from the insurance company regarding the October 31 e-mail, THI confirmed they had not heard from Liberty and that any days Hartwell remained past November 8 would be her direct responsibility.

Thus, neither the Confirmation nor the e-mail correspondence provides evidence that THI represented to Millar that it would continue to pay rent after it issued a notice to vacate. Nor did THI suggest at any point that it would be

responsible for rent payments as long as Hartwell remained a tenant in Millar's rental unit. Rather, after sending the notice to vacate, Cruz reiterated on four separate occasions that payments were terminated past November 8 and Hartwell would otherwise be responsible for rent afterwards. The only representations suggesting payment from THI beyond November 8, 2019 are from Hartwell, and her representations cannot be the basis for holding THI or Liberty liable for misrepresentation. THI did not need to further confirm that it was not going to pay when it had given Millar the required 20-day notice and repeatedly and unequivocally stated that after November 8, Millar would have to seek payment from Hartwell.

Further, THI and Liberty highlight two separate occasions when Millar acknowledged in e-mails to Hartwell that the "lease agreement" is between himself and Hartwell and does not implicate the insurance company. This evidence indicates Millar was aware he did not have a lease agreement with THI or Liberty and that Hartwell was "personally responsible" for payments after THI ceased payments on November 8, 2019. Thus, Millar cannot establish that he relied on any misrepresentations.

Because we find that THI did not misrepresent to Millar that it would continue to make Hartwell's rent payments after providing the notice to vacate, we also conclude Millar's CPA claim fails as a matter of law, as there was no proof of a deceptive act or practice, the first element of a claim. Accordingly, the trial court properly dismissed the CPA claim.

As for Millar's equitable estoppel claim, THI made no admission, statement or act that created a reasonable expectation that, contrary to the Confirmation, rent would be paid as long as Hartwell remained a tenant at Millar's rental or after THI gave notice to vacate, nor would it have been reasonable to rely on any such statement. To the contrary, THI repeated on four separate occasions after issuing the notice to vacate that payments would cease after November 8, 2019 and that Hartwell would be responsible for rent going forward. Thus, the record evidence does not establish a genuine issue of material fact regarding the equitable estoppel claim.

## CONCLUSION

We affirm the trial court's order granting summary judgment dismissing all claims against THI and Liberty.

_____
Cheung, J.

WE CONCUR:

_____, ACJ          _____

20