IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| MD INJURY CARE P.S., a Washington professional service corporation,<br><br>Appellant,<br><br>v.<br><br>CENTIOLI & BIESOLD LLC, a Washington limited liability company,<br><br>Respondent. | No. 87218-4-I<br><br><br>UNPUBLISHED OPINION |

BOWMAN, A.C.J. — MD Injury Care PS (MD) appeals the trial court's order dismissing its breach of contract claim against Centioli & Biesold LLC (Centioli). It argues the trial court erred by ruling that the implied duty of good faith and fair dealing did not apply to Centioli's exercise of discretion in approving proposed signage under its commercial lease. Because the implied duty of good faith applied to Centioli's exercise of discretion and a reasonable juror could infer from the undisputed evidence that Centioli did not act in good faith, we reverse and remand for further proceedings.

FACTS

Centioli owns and manages Genesee Plaza, a retail shopping center in Seattle. Centioli leases units within the plaza to various commercial tenants. In 2000, Centioli executed a lease with Walgreen Co. (Walgreens). The lease contained an exclusivity provision providing that except for Walgreens, "no portion" of Genesse Plaza's commercial space would be used for "the operation

of a medical diagnostic lab and/or the provision of treatment services."  The lease was set to expire on August 31, 2021, but it contained an option to extend through December 2030 with an option notice date of February 28, 2021.

In March 2019, MD asked Centioli to lease commercial space in Genesee Plaza.  MD specializes in medical evaluation and treatment for patients injured in motor vehicle accidents.  MD operated several clinics under different names, including "MD Injury Care" in Renton and "Auto Injury Urgent Care" in Federal Way.  MD used Auto Injury Urgent Care for the Federal Way clinic because unlike the Renton clinic, it relied more on foot traffic than medical referrals, and MD believed that the descriptive and attention-grabbing name attracted more patients.

Before agreeing to execute a lease with MD, Centioli contacted Walgreens to seek its consent.  Walgreens at first rejected the idea because of a concern that MD's business may conflict with its own in-store medical clinic.  But after several months of communication, Centioli ultimately secured Walgreens' consent.  Centioli asked Walgreens whether "any conditions" were tied to its consent for MD's use, and Walgreens imposed none.  Walgreens assured Centioli that "this is a successful Walgreens location that we anticipate to operate long-term."

In November 2019, MD and Centioli executed a lease.  The lease identified MD's trade name as "MD Injury Care."  It called for MD to begin paying monthly rent on February 1, 2020 and required MD to keep the premises open for business "during the entire term" of the lease.  And the exclusivity provisions

in Walgreens' lease influenced the terms of MD's lease. Section 1.1.4 of MD's lease specified that MD could operate as a "[s]pecialty musculoskeletal injury clinic, including physical and massage therapy," but nothing more. Further, under section 9.5 of the lease, MD agreed to comply with any existing covenant, including the exclusivity clause in Walgreens' lease.

Section 28 of the lease governed MD's signage. It provided that MD must "erect one sign on the front of the Premises no later than the date Tenant opens for business, in accordance with a design to be prepared by Tenant and approved in writing by Landlord." And MD could not install a sign without Centioli's written approval. Finally, section 28 provided that "[i]n the event Tenant shall install a sign which does not meet the Landlord's sign criteria, Landlord may notify the Tenant in writing about the non-conformities of the signage" and have it removed at MD's expense. The lease did not define "Landlord's sign criteria."

In January 2020, MD proposed a sign to Centioli for approval. The sign identified the clinic as Auto Injury Urgent Care. MD chose to use that name because like the Federal Way clinic, it intended to rely on foot traffic to attract clients. Centioli expressed concern about the sign. It e-mailed MD, saying:

> I think the change from MD Injury Care to Auto Injury Urgent Care may be problematic. As you know, it took months to obtain Walgreens' approval of MD Injury Care, which is also the Trade Name in the Lease. Accordingly, I think any departure from that name would need to be vetted, and I'm concerned that the use of Urgent Care (as opposed to Injury Care) may infringe on Walgreens' business, which currently includes an onsite Swedish Express Care.

MD did not respond to Centioli's e-mail.

3

Rent commenced under the lease on February 1, 2020, but MD did not open for business. Over the following months, Centioli repeatedly asked MD to confirm that it would use signage bearing its approved trade name and to provide an update on its plan to open for business. In March 2020, both parties tried to reach a consensus on the signage issue, including discussing it by phone. But in June 2020, Centioli again told MD that its signage needed to use the trade name approved by Walgreens, saying:

> As a follow-up to our call, the operation needs to match that which is named in the Lease and approved by Walgreens. If you choose to advertise additional services, the Landlord makes no representation or warranty that it will be acceptable to Walgreens, and you agree to indemnify the Landlord for any damages that may result.

In response, MD argued that Walgreens' exclusivity clause restricted only MD's permitted use of the space. And no part of the lease required MD to operate under its trade name. MD also emphasized that Centioli's refusal to approve its proposed sign created "hesitancy of uncertainty[,] limiting [its] initiation of starting operations." Still, Centioli maintained its position, stating that it would "defer to Walgreens' opinion" on the propriety of MD's proposed signage and that MD agreed to assume the risk of not using its trade name as it appeared in the lease.

On September 16, 2020, Walgreens notified Centioli that it intended to exercise the extension on its lease and wanted to discuss specific terms. It told Centioli that "time is of the essence," as the option notice deadline was February 2021.

In November 2020, Centioli notified MD that it breached the lease by failing to open and carry on business during the term of the lease, which commenced on February 1, 2020. It told MD that it would charge additional rent "equal to 1/30th of the Monthly Base Rent" for each day MD is in breach.[1] Centioli sent MD e-mails in January and February, reminding it of the breach.

In June 2021, four months later, MD responded that the "only" delay in opening was because of staff shortages caused by the COVID-19 pandemic and that it would open "as soon as [it] can." Around that time, MD installed two signs on its storefront facing Walgreens, identifying the clinic as Auto Injury Urgent Care. But MD did not open the clinic at that time because it wanted to first gauge Walgreens' response to the signage. Walgreens did not object.

After seeing the signs, Centioli again instructed MD to use its approved trade name. MD refused and insisted on operating as Auto Injury Urgent Care. Centioli again told MD that it had no approval to operate under that name and that its noncompliance could result in legal repercussions. MD proposed the parties arrange a meeting with Walgreens to resolve the dispute. But Centioli refused, asserting that MD must "operate within the parameters of our Lease, which required third-party consent and is restricted thereby." And Centioli refused to otherwise contact Walgreens to ask its opinion about the sign.

In July 2023, Centioli's attorney sent MD a "Demand for Lease Compliance and Payment of Arrearage." The demand notified MD it had

---

[1] Under section 31 of the lease, in the event MD did not timely open for business, Centioli had the right to "collect not only the Monthly Base Rent herein provided, but additional rent at the rate of one-thirtieth (1/30) of the Monthly Base Rent herein provided for each and every day that Tenant shall fail to conduct its business."

breached the lease under section 31 by not opening and owed $165,022.37, consisting mostly of unpaid additional rent and default interest. Centioli gave MD 10 days to contact it and arrange for payment in full or face an unlawful detainer action. MD disputed the breach, arguing it could not open for business because of Centioli's "unreasonable restrictions" on signage. MD demanded Centioli remove the restrictions and pay damages and reserved the right to sue. Centioli then initiated an unlawful detainer action but dismissed it in September 2023 when MD surrendered the property.[2]

In August 2023, MD sued Centioli for breach of contract. MD alleged that Centioli's unreasonable refusal to approve its proposed signage violated the implied duty of good faith and fair dealing. MD asked for damages and attorney fees. Centioli counterclaimed, alleging that MD breached the lease by failing to timely open and operate its clinic. Centioli also asked for damages, including "past due rent and other charges."

Both parties moved for summary judgment. MD asked the court to grant partial summary judgment in its favor, finding that Centioli breached its implied duty of good faith and fair dealing and that section 31 of the lease amounted to an "unenforceable [ ] unlawful penalty." Centioli asked the court to find that the implied duty does not apply to the lease provision governing signage and dismiss MD's lawsuit. Centioli also asked for attorney fees and costs and a judgment for $89,778.19, consisting of unpaid rent, unpaid triple-net amounts, late fees, and interest.

---

[2] Centioli's unlawful detainer action is not at issue in this appeal.

In July 2024, the trial court granted Centioli's motion for summary judgment, dismissed MD's breach of contract claim with prejudice, and entered judgment for Centioli for $89,778.19 in unpaid rent. The court denied MD's motion for partial summary judgment. Centioli then moved to voluntarily dismiss any remaining claims, and the court granted its motion without prejudice. Finally, Centioli moved for attorney fees and costs under the lease. The court granted the motion and awarded Centioli $108,775.94 in attorney fees and costs.

MD appeals.

## ANALYSIS

MD argues the trial court erred by dismissing its breach of contract claim at summary judgment and awarding attorney fees and costs to Centioli without first segregating fees for abandoned claims. Centioli also asks for appellate attorney fees and costs. We address each argument in turn.

1. Summary Judgment

We review a grant of summary judgment de novo, engaging in the same inquiry as the trial court. *Kelley v. Tonda*, 198 Wn. App. 303, 310, 393 P.3d 824 (2017). Summary judgment is proper only if there are no genuine issues of material fact and the moving party is entitled to judgement as a matter of law. CR 56(c); *Vasquez v. Hawthorne*, 145 Wn.2d 103, 106, 33 P.3d 735 (2001).

A defendant moving for summary judgement can challenge whether the plaintiff can produce competent evidence to support the essential elements of its claim. *Boyer v. Morimoto*, 10 Wn. App. 2d 506, 519, 449 P.3d 285 (2019). The plaintiff must then provide sufficient evidence to support those elements. *Young*

*v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The plaintiff may not rely on the allegations in their pleadings. *Id.* Rather, the plaintiff must respond with evidence setting forth specific facts to show that there is a genuine issue for trial. *Id.* at 225-26. We consider all facts submitted and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party. *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000).

The trial court should grant summary judgment when the undisputed material facts show that "reasonable persons could reach but one conclusion." *Vasquez*, 145 Wn.2d at 106. But summary judgment is improper if those facts can support reasonable but conflicting inferences. *Southside Tabernacle v. Pentecostal Church of God*, 32 Wn. App. 814, 821, 650 P.2d 231 (1982).

We interpret the terms of a contract de novo. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). In doing so, we try to determine the parties' intent by focusing on the objective manifestations of the contract rather than on the unexpressed subjective intent of the parties. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Clear and unambiguous contracts are enforced as written." *Grey v. Leach*, 158 Wn. App. 837, 850, 244 P.3d 970 (2010).

A party alleging breach of contract must show that the contract creates a duty, that the defendant breached that duty, and that the breach proximately harmed the claimant. *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.,* 78 Wn. App. 707, 712, 899 P.2d 6 (1995). Every contract carries an implied duty of good faith and fair dealing. *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d

356 (1991). Generally, this requires mutual cooperation so that each party "may obtain the full benefit of performance." *Id.* Parties to a contract must maintain " 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Edmonson v. Popchoi*, 172 Wn.2d 272, 280, 256 P.3d 1223 (2011) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (AM. LAW INST. 1981)).

The implied duty of good faith and fair dealing does not impose a "free-floating obligation of good faith on the parties." *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 113, 323 P.3d 1036 (2014). Instead, the duty arises when one party has discretionary authority to determine a future contract term. *Id*. at 113. The duty does not apply when a contract gives one party unconditional authority to determine a term. *Id*. at 119-20. And the duty does not add or contradict express contract terms. *Id*. at 113.

In *Rekhter*, the Department of Social and Health Services (DSHS) contracted with individual care providers to deliver essential services to its clients. 180 Wn.2d at 108. But the contracts gave DSHS the discretion to pay care providers for "authorized hours," a term to be defined by DSHS after the contracts were finalized. *Id*. at 112. DSHS later created a rule that reduced authorized hours, and the care providers sued, alleging breach of the implied duty of good faith and fair dealing. *Id*. at 108-10. Our Supreme Court concluded that the implied duty of good faith applied to DSHS' definition of the contract term. *Id*. at 112. It reasoned that the contract gave DSHS discretion over future terms, leaving DSHS with "a specific contractual obligation to determine and pay

9

providers for hours authorized in the service plans." *Id*. at 113. This left DSHS with the discretion to set a future contract term—the quantity of hours and types of services for which providers will be compensated. *Id*. at 113-14. And the trial court properly instructed the jury that DSHS violated that duty if it exercised its discretion " 'in a manner that prevented the provider from attaining his or her reasonable expectations under the contract.' " *Id.* at 119.

Here, section 28 of the lease prohibited MD from erecting a sign without Centioli's approval. And under the lease, Centioli was to decide whether to approve the signage by applying the "Landlord's sign criteria." But the lease did not define the "sign criteria." So, the lease left Centioli with a specific contractual obligation after the lease was executed—to determine the "sign criteria" and apply it to MD's proposed signage. And, like DSHS' definition of "authorized hours" in *Rekhter*, Centioli's exercise of discretion in defining the sign criteria could prevent MD from attaining its reasonable expectations under the lease. Because the lease required MD to "erect one sign on the front of the Premises not later than the date [MD] opens for business," Centioli's refusal to approve a sign could force MD to breach the lease. As a result, the implied duty of good faith and fair dealing applied to Centioli's exercise of discretion in defining the sign criteria.

Citing *Johnson v. Yousoofian*, 84 Wn. App. 755, 930 P.2d 921 (1996), Centioli argues that the duty of good faith did not apply to its exercise of discretion because the lease left it with unconditional authority to withhold approval of a sign. We disagree.

In *Johnson*, the parties executed a commercial lease. 84 Wn. App. at 756. The lease's assignment clause gave the landlord the right of first refusal, providing, " 'Lessee shall not . . . assign this lease or any part thereof without the written consent of the Lessor.' " *Id.* at 756-57.[3] The lessees sought the lessor's approval for assignment, but he refused. *Id*. at 758. The lessees sued, arguing that the lessor's refusal without any reasonable explanation violated the implied duty of good faith and fair dealing. *Id*. at 758-59. We rejected that argument, concluding that the plain language of the lease imposed no obligation on the landlord "to consent to any assignment sought by the lessees." *Id.* at 762. And "[i]f there is no contractional duty, there is nothing that must be performed in good faith." *Id*.[4]

This case is not like *Johnson*. Here, section 28 of the lease imposed a specific contractual duty on Centioli to apply the "Landlord's sign criteria" to MD's proposed signage and ultimately approve or disapprove it. But it left the interpretation of the term "sign criteria" to Centioli's future discretion. And, unlike the right-of-first refusal provision at issue in *Johnson*, the sign approval provision

---

[3] Alteration in original.

[4] We note that *Johnson* adheres to an old common-law view that a landlord may arbitrarily or unreasonably refuse to consent in right-of-first refusal cases. *See Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 665-66 (Tenn. 2013). The " 'modern' " position imposes an implied duty of good faith and fair dealing to such an exercise of discretion. *Id.* As of 2013, states adopting the "modern" approach include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Idaho, Illinois, Louisiana, Maryland, Nebraska, New Mexico, Ohio, Oregon, and Utah. *Id.* at 666 n.21. Even in states that still follow the common law rule, such as Vermont, the landlord's ability to arbitrarily or unreasonably withhold consent is limited to right-of-first refusal cases. *See Century Partners, LP v. Lesser Goldsmith Enters., Ltd.,* 184 Vt. 215, 224-25, 958 A.2d 627 (2008) (Vermont Supreme Court holding that the duty of good faith applies where the exercise of a landlord's discretion could effectively force a tenant into continued breach of the lease).

in MD's lease was essential to its ability to obtain the full enjoyment and benefit of the lease. Because approval was necessary for MD to open for business, the lease implied that Centioli's written approval would not be unreasonably withheld.

The record also shows that MD presented sufficient evidence from which a juror could infer that Centioli did not exercise good faith and fair dealing when refusing to approve its signage. Centioli offered several reasons for refusing to approve MD's signage. It first told MD that "the use of Urgent Care (as opposed to Injury Care) may infringe on Walgreens' business" in violation of Walgreens' exclusive use clause. Centioli also claimed that MD's "operation needs to match [its trade name] in the Lease." And it expressed concern that any issue with signage may affect Walgreens' decision whether to exercise its lease renewal option.

But Centioli produced no evidence showing that Walgreens ever required MD to use its trade name on MD's exterior sign or in advertising. And Centioli's restrictive covenant with Walgreens merely refers to "use" and not "name." Likewise, nothing in MD's lease required it to use its trade name on signage. When MD pointed this out, Centioli claimed that it would defer to Walgreens' opinion. But Centioli later admitted it never reached out to Walgreens to ask its opinion on MD's proposed signage. And in June 2021, Centioli again refused to seek Walgreens' opinion on the signage. Centioli explained that it did not want to contact Walgreens because Walgreens' lease was about to renew, and it "did not want to give [Walgreens] any reason to not continue their tenancy." But the

option date for Walgreens to renew its lease had passed on February 28, 2021, so the question of Walgreens' renewal had been resolved.[5]

Viewing the evidence in a light most favorable to MD, a juror could infer that Centioli's reasons for refusing to approve MD's signage was pretextual, forcing MD to breach the lease and incur additional rent and costs.

Finally, Centioli argues that even if the trial court erred by granting summary judgment based on the implied duty of good faith, MD's lawsuit must be dismissed for failure to provide Centioli sufficient notice of its breach. We disagree.

Under section 22 of the lease, MD must provide Centioli with a written default notice 30 days before MD can initiate any legal action. Centioli claimed that MD failed to provide such notice. But the record shows that on July 10, 2023, MD sent Centioli a default notice, titled "Demand for Paid Rent, Signage, Tenant Improvements, Loss of Business Profit." In the notice, MD alleged Centioli "unreasonably restricted [its] storefront signage [and] online advertising," causing MD to be unable to open. MD further asserted it was "legally entitled to seek expectation damages, consequential damages, and either the re[s]cission of the Lease or the Landlord's compliance with the Lease for the remaining term." And more than 30 days passed before MD sued Centioli on August 23.[6]

---

[5] We also note that MD installed two signs on its storefront facing Walgreens, identifying the clinic as Auto Injury Urgent Care, and Walgreens did not object to the signage.

[6] Centioli also argues on appeal that MD cannot show that its refusal to approve signage caused MD's failure to open for business. But Centioli did not challenge causation below, so we do not address the issue for the first time on appeal. *See* RAP 2.5(a).

We reverse the trial court's order dismissing MD's lawsuit at summary judgment and remand for further proceedings.[7]

2. Attorney Fees in the Trial Court

MD argues the trial court abused its discretion by awarding Centioli attorney fees and costs under the lease agreement without properly segregating time spent working on its abandoned claim for additional rent or explaining why segregation is not possible. Although we reverse summary judgment dismissal, we take the opportunity to address MD's argument.

We review the reasonableness of a trial court's fee award for abuse of discretion. *Ethridge v. Hwang*, 105 Wn. App. 447, 460, 20 P.2d 958 (2001). A trial judge has broad discretion to determine the reasonableness of an award, and we will not reverse the award unless the court manifestly abused its discretion. *Id.* Still, "the record must show a tenable basis for the award." *Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now*, 119 Wn. App. 665, 690, 82 P.3d 1199 (2004).

When a party is authorized to recover attorney fees for only some claims, the award must " 'reflect a segregation of the time spent on issues for which fees are authorized from time spent on other issues.' " *Loeffelholz*, 119 Wn. App. at 690 (quoting *Mayer v. City of Seattle*, 102 Wn. App. 66, 79-80, 10 P.3d 408 (2000)). This is required even if the claims overlap or are interrelated. *Id.* But if the trial court finds the claims are so related that no reasonable segregation is possible, it need not segregate attorney fees. *Id.* at 691.

---

[7] MD does not challenge the trial court's ruling that it breached the lease for failure to timely open for business, so we do not address it here.

Here, the trial court did not engage in a segregation analysis. But it is unclear whether Centioli sought to recover additional rent at summary judgment. In its counterclaim, Centioli sought damages for MD's "past due rent and other charges." And it sought only unpaid rent, triple net amounts, and interest in its motion for summary judgment. Still, the trial court ruled at summary judgment that "there is a genuine dispute as to material fact" whether MD owes additional rent under section 31 of the lease for not opening its business. The trial court should have made a clear record supporting its fee award and decision not to segregate the claims.

In any event, because we reverse its order dismissing MD's breach of contract claim, we also reverse the court's fee award pending final resolution of the lawsuits.

3. Attorney Fees on Appeal

Centioli requests attorney fees and costs on appeal under the lease as the prevailing party of the lawsuits. Under RAP 18.1(a), we may award attorney fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses."

Centioli requests fees under section 34.13 of the lease, which provides:

[T]he prevailing party in [a lawsuit] shall, in addition to all other payments required herein, receive from the other, all the costs incurred by the prevailing party including arbitration costs and reasonable attorneys' fees and such costs and reasonable attorneys' fees which the prevailing party incurred on any appeal.

"In general, a prevailing party is one who receives an affirmative judgment in [its] favor." *Riss v. Angel*, 131 Wn.2d 612, 633, 934 P.2d 669 (1997). If

15

neither party fully prevails, the court should award fees to the "substantially prevailing" party, determined by how much relief each side obtains. *Id*.

Because we reverse the trial court's order dismissing MD's lawsuit and remand for further proceedings, neither party has yet prevailed. We authorize the trial court to award appropriate attorney fees and costs after the lawsuits are resolved. *See* RAP 18.1(i) ("The appellate court may direct that the amount of fees and expenses be determined by the trial court after remand.").

We reverse the trial court's order dismissing MD's lawsuit at summary judgment, reverse the award of attorney fees and costs to Centioli, and reserve the determination of awarding appellate fees and costs for the trial court. We remand for further proceedings.

_____, ACJ

WE CONCUR:

_____
Chung, J.

_____
Díaz, J.

16